UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * *
                                  *
SIGNALQUEST, INC.,                *
            Plaintiff,            *  11-cv-392-JL
                                  *  January 26, 2016
            v.                    *  11:00 a.m.
                                  *
TIEN-MING CHOU, ET AL.,           *
            Defendant.            *
                                  *
* * * * * * * * * * * * * * * * *

TRANSCRIPT OF CLAIM CONSTRUCTION
HEARING and ARGUMENT ON SUMMARY MOTION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

For the Plaintiff:      Robert R. Lucic, Esq.
                        Peter Anthony Nieves, Esq.
                        Brian David Thomas, Esq.
                        Sheehan Phinney Bass & Green
                        1000 Elm Street, 17th Floor
                        P.O. Box 3701
                        Manchester, NH 03105

For the Defendant:      Mark C. Rouvalis, Esq.
                        Nicholas F. Casolaro, Esq.
                        McLane Graf Raulerson & Middleton
                        900 Elm Street, P.O. Box 326
                        Manchester, NH 03105

                        Timothy N. Trop, Esq.
                        Trop, Pruner & Hu, PC.
                        1616 South Voss Road, Ste. 750
                        Houston, TX  77057

Court Reporter:         Sandra L. Bailey, LCR, CRR
                        Official Court Reporter
                        U.S. District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1454

```
 1                        BEFORE THE COURT

 2              THE CLERK:  The Court has before it for

 3    consideration this morning a claim construction hearing

 4    and oral argument on summary judgment in civil case

 5    11-cv-392-JL, SignalQuest, Incorporated versus Chou, et

 6    al.

 7              THE COURT:  All right, good morning everyone.

 8    My game plan is to do claim construction first and

 9    summary judgment second.  It's probably going to take a

10    while.

11              Why don't counsel identify themselves for the

12    record.  Let me know who is going to be doing the bulk

13    of the advocacy and then we'll get started.

14              MR. LUCIC:  Good morning, your Honor.  Robert

15    Lucic on behalf of SignalQuest.

16              MR. NIEVES:  Good morning, your Honor.  Peter

17    Nieves on behalf of SignalQuest.

18              MR. THOMAS:  Brian Thomas on behalf of

19    SignalQuest.

20              MR. TROP:  Tim Trop on behalf of the defendant

21    Chou and Oncque.

22              MR. ROUVALIS:  Mark Rouvalis for the same.

23              MR. CASOLARO:  Nick Casolaro for the

24    defendant.

25              THE COURT:  All right.
```

1        MR. ROUVALIS:  And Attorney Trop is going to

2   be leading the presentation.

3        THE COURT:  That's fine.  And I should put on

4   the record one of the interns in my chambers at the

5   moment is Elizabeth Velez.  She's a law student working

6   in my chambers.  She is going to be working at the

7   McLane law firm after graduation, but she's not being

8   permitted to work on this file at all.  I just want to

9   make sure you know that, but she's here watching today.

10  Please.

11       MR. LUCIC:  Thank you, your Honor.  So we do

12  actually, we have a power point presentation.  I think

13  --

14       THE COURT:  Let me ask you this.  Do you want

15  to use the power point to -- how fast are you on this

16  because I want to do these one claim at a time.

17       MR. LUCIC:  Yup, absolutely, your Honor.

18       THE COURT:  Okay.

19       MR. LUCIC:  And I think that's the way we

20  tried to set it up, your Honor.

21       THE COURT:  Okay.  Let me ask this question.

22  Local rules allow for ten claims.  We're arguing about

23  19 here, right?  I get it.  I don't remember if anybody

24  asked for leave, but regardless we're going to do them

25  all.  We're going to do them all.  But my only question

```
 1    is, have you reached agreement on any of these?  You

 2    have.  Somebody is nodding.  Is there any agreement on

 3    anything?  I want you to let me know so I can cross it

 4    off my list.

 5            MR. TROP:  Not on the entire claims, your

 6    Honor, but on some of the terms in some claims.

 7            THE COURT:  All right.  Yeah, that's what I

 8    meant.

 9            MR. LUCIC:  Yes.  And I think we set that

10    forth in our stipulation, your Honor, the terms that we

11    had come to agreement on.  And I think as part of the

12    prehearing stipulation I think it sets forth the ones

13    that we agreed to ahead of time.

14            MR. NIEVES:  And those won't be ones we're

15    just going to --

16            MR. LUCIC:  And we won't discuss those here.

17            THE COURT:  Oh.  Let's just proceed.

18            MR. LUCIC:  Your Honor, if I may, this is a

19    paper copy of the power point presentation that you're

20    going to see.  I've given a copy to counsel as well.

21            THE COURT:  Thanks.

22            MR. LUCIC:  So, we thought it would be helpful

23    in the first instance given the procedural posture where

24    we are, if your Honor recalls, SignalQuest originally

25    brought a DJ on the '979 patent that we've already had
```

1    the Markman hearing on.  We had amended our claims to

2    assert affirmative patent infringement claims based on

3    the '748 and '866 and '867 patents.  That action was

4    stayed pending the reexamination.  And what we are now

5    talking about are the claims that have come out of that

6    reexamination process.

7              THE COURT:  Fourth amended complaint.  Right?

8              MR. LUCIC:  Precisely, your Honor.  Precisely.

9    And so what we thought would be useful here in the first

10   instance was to give just a brief overview of what the

11   device is, what the invention is, to show everybody how,

12   you know, what the claim invention is, and Mr. Nieves is

13   going to talk a little bit about what happened in the

14   reexamination process so we can set that as the baseline

15   because I think a number of the arguments --

16             THE COURT:  It matters, yup.

17             MR. LUCIC:  Really are affected by what has

18   happened in the reexamination, and then we will get into

19   the specifics of the claim terms, and I think we will be

20   able to go through those relatively quickly, and then we

21   can deal with the motion for summary judgment at the

22   end.

23             So, Mr. Nieves, if you would like to start.

24             MR. NIEVES:  Absolutely.  Thank you for your

25   time, your Honor.  So this is supposed to be the fun

1   part of patent litigation, right?  We get to look at the

2   device.  So, what we do is we actually took an example

3   of the device and we brought it with us here.  What the,

4   go ahead to the first slide, please.  All right.  What

5   the invention is is it's called an omnidirectional tilt

6   and vibration sensor.  That means it works in all

7   positions.  Why is that a big deal?  Most of the other

8   sensors out there only work in one position.  There are

9   some that don't, but most of them only work in one

10  position.

11          The nice thing about this, I want to put this

12  now to the screen, so I, okay, so this is an example of

13  the omnidirectional tilt and vibration sensor in action.

14  As you can see, it's in one plane.  It's basically laid

15  out horizontally.  If we hit the table, you see how the

16  LED lights up?

17          THE COURT:  Yup.

18          MR. NIEVES:  It tells you vibration.  If you

19  turn it to one position like this position here, it's

20  horizontal, once the ball stays still, if there's any

21  motion, the LEDs goes on.  If you turn it upsidedown,

22  same idea, it works in all positions.  Once the ball

23  stays still, you tap it, the LEDs go off.  So it's

24  omnidirectional.  It works in all directions.

25          The reason why that's a big deal, so the

1   reason why that's a big deal, if you think of RFID tags,

2   radio frequency identification tags, these are used in a

3   lot of different environments, one of them being with

4   cattle.  So they actually put on the ears of the cattle

5   these kind of devices, and so they can tell if there's

6   motion the cattle are alive, if there's no motion the

7   cattle is not alive.  Another environment is if you look

8   in a warehouse and there's a thousand units, let's say

9   there's a thousand boxes of computers in them, and if

10  you want to know if any of those boxes were ever moved,

11  you can put these kind of RFID tags that are

12  omnidirectional and you don't have to worry about this

13  side up anymore.  You don't have to put it in one

14  position.  You can put it horizontal, any position, and

15  now if that box moves, you know that it's moved, and you

16  can check your inventory based on movement.  So that's

17  why omnidirectional is such a big deal.

18          The same basic components are utilized in

19  here.  There's a first electrically conductive element;

20  there's a second electrically conductive element; there

21  is an electrically insulative element; and there are two

22  electrically conductive weights.  That's basically the

23  structure.  It's very clean.  It's very concise.  And as

24  you can see from an example of the cross section, that's

25  how it looks from the inside.  Let's go to the next

1    slide.  Again, here is the same --

2            THE COURT:  How did you just describe 140

3    again, though, two conductive elements.

4            MR. NIEVES:  Let me clear this for you.

5            THE COURT:  140.

6            MR. NIEVES:  Yes, the 140 is the electrically

7    insulative element.  That is nonconductive.

8            THE COURT:  Okay.

9            MR. NIEVES:  Okay?  Now, so basically what you

10   have is electricity comes in through one side, goes

11   through the first electrically conducted element, it

12   hits the proximate portion of it, goes through to the

13   distal portion, goes into the proximate end of the

14   electrically insulative element, comes through to the

15   two balls, then comes into the distal portion of the

16   second electrically conductive element and out of the

17   proximate portion over to the completion of the circuit.

18   If the balls are detached at any time, the circuit is

19   open, and that's how you know there's basically

20   movement.  Let's go to the next line.

21            Okay, and this is a cross section basically

22   talking about what we just talked about.  I'm just going

23   to go past this and go right into the prosecution

24   history.

25            Okay, now, what we have is, all right, this is

1    the example of the assembly of the product, okay, and

2    why it's so clean and so simple to utilize.

3           The first electrically conductive element goes

4    into the electrically insulative element, the balls go

5    inside, and then you have the second electrically

6    conductive element that goes into place.  It's again,

7    very clean, which is a big part of the success here.

8           So, let's go back to the slide presentation.

9    All right, now this --

10          THE COURT:  Obviously the -- this is a dumb

11   question.

12          MR. NIEVES:  No, go right ahead.

13          THE COURT:  The electrically conductive

14   elements don't touch each other.  The whole point, they

15   don't touch each other within the insulative element;

16   right?

17          MR. NIEVES:  You got it.  The ball --

18          THE COURT:  We both can't argue at the same

19   time, can't do it.  When -- that animation you showed me

20   a minute ago, it almost made it look like that the

21   electrically conductive elements were long enough that

22   that distal portion of that is long enough to connect,

23   but they don't connect.

24          MR. NIEVES:  No, not at all.

25          THE COURT:  That's what I thought.

1          MR. NIEVES:  No, the balls themselves complete

2     the circuit.

3          THE COURT:  Yup.

4          MR. NIEVES:  And that's precisely the question

5     you just had is why we have this next slide here,

6     because this actually shows that -- there we go.

7          THE COURT:  There it is.

8          MR. NIEVES:  Pause it.  Okay, you can't really

9     see it there.

10          THE COURT:  I get the idea.

11          MR. NIEVES:  You get the idea?  We basically

12     wanted to show you -- all right, there, pause.  So you

13     see that there's a gap between the two, the distal

14     portion of the first electrically conductive element and

15     the distal portion of the second electrically conductive

16     element, there's a gap in there, and the only thing that

17     completes that circuit is the balls.

18          The reason why we wanted to show you this

19     video here was because it shows you that if it's in a

20     horizontal position, its works; if it's in a horizontal

21     or a vertical position, it always works.  The circuit is

22     complete when the balls touch the side.

23          THE COURT:  There hasn't been much argument

24     about the balls.

25          MR. NIEVES:  Right.

1    THE COURT:  The balls are always, is that

2  always the case, there's been some discussion about, you

3  know, cylindrical versus square.  But the balls are

4  always balls.

5    MR. NIEVES:  Absolutely.  And what you just

6  mentioned is what we're going to go into next, which is

7  the shape essentially.  So, what we wanted to touch base

8  on next is to go over the reexamination procedure

9  because that specifically is one of the arguments that's

10  utilized by the defendants with regard to shape, so we

11  thought we'd cover that now before we went into our --

12    THE COURT:  That really to me is, you know,

13  this goes more to summary judgment, but it's probably

14  one of the more interesting and more difficult parts of

15  the case.

16    MR. NIEVES:  Sounds good.  Okay, so in general

17  a reexamination procedure, I'm just going to give a real

18  quick summary of how that happens and then what happened

19  in the present case which will help us put this all in

20  perspective.

21    In a general reexamination procedure there's a

22  request that's filed.  After a request is filed if

23  there's a substantial question of patentability, the

24  order is granted for the ex parte reexamination.  In the

25  present case that happened.

1    A non-final office action is sent out by the

2 patent office basically saying, well, we believe there's

3 a substantial question of patentability and we have

4 certain rejections.  Then the patent owner has the

5 opportunity to provide a response.  With that response

6 the patent office believes that all the arguments have

7 been taken care of, then they provide an allowance.  If

8 not, you get a final office action, and that's basically

9 the process.  After the first office action you're

10 allowed to have communication with the examiner and the

11 examiner interviews.  Okay.  Go ahead.

12    All right, the result of the prosecution

13 history here, the next slide is going to go over this

14 exact case to address what your Honor is referring to.

15 After the results of the prosecution history here you've

16 got six levels of review that happen essentially with

17 the same technology.  We recall the three different

18 patents, the '748, the '866 and '867 patent, all have

19 essentially the same specification with different

20 breadth of claims.  So, you had the original prosecution

21 and then you have three levels of reexamination

22 prosecution.

23    For the reexamination you had a three-person

24 panel with over 30 years of experience, over 40

25 references were considered, and not once was

1   indefiniteness ever presented in any of the examination

2   procedures.

3           For this specific case, now, the patents were

4   all challenged.  The rejection that was received for the

5   substantial question of patentability had anticipation

6   rejections and obviousness rejections.  The anticipation

7   rejection means that there's one reference that teaches

8   all the limitations of the claim.  And the obviousness

9   rejection means that there's two, three or more

10  different references that have to be combined to claim

11  that that claim is actually obvious.

12          In the present case, after the first office

13  actually came out with anticipation rejections and

14  obviousness rejections, we filed an amendment to the

15  claims that were rejected under anticipation.  Okay.

16  For the anticipated claims, all of those claims were

17  then claimed by the patent office to no longer be

18  rejected under anticipation but instead under

19  obviousness.  After the obviousness rejection came

20  through, we provided commercial success elements to get

21  over that.  And at that point the claims were allowed.

22          There were certain dependent claims that we

23  did not provide legal argument for except to say that

24  those dependent claims depended upon an independent

25  claim that isn't allowable.  There is no reference to

1   anything on a specific type of gas being inside the

2   sensor or a certain shape being utilized for the

3   exterior of the electrically insulative element.  Can

4   you just go forward to the next slide.  There.

5            This, your Honor, lays out this exact case,

6   okay.  So, as you can tell, it started out with the

7   first office action.  Some claims, we actually laid it

8   out for you which claims were rejected for anticipation,

9   which for obviousness.

10           The response came out.  We amended the claims

11  that were rejected for anticipation.  Those claims were

12  not objected to based on shape or anything to do with

13  gas.  They were just rejected based -- all the claims

14  were basically rejected.

15           The claims that were rejected as obvious, we

16  provided legal arguments as to why those claims should

17  be allowed.

18           Now, the anticipated claims then received a

19  rejection for obviousness, and that's when we provided

20  the commercial success argument.

21           THE COURT:  Yup.

22           MR. NIEVES:  And you've seen all that material

23  at this point.

24           THE COURT:  I have a good understanding of

25  this process.

1          MR. NIEVES:  So there's just one part, if I

2     might add.

3          THE COURT:  No, I'm not trying to hold you

4     back.

5          MR. NIEVES:  Great.  So, we had an examiner

6     interview after the first office action, okay, and we

7     presented after the, after we received a final office

8     action, because they are all obviousness rejections, we

9     presented to the patent office commercial success

10    arguments.

11         The patent office said, you know, you've got

12    some really good arguments here.  We need some

13    additional information in the following sections here.

14    And we said okay, sure, we provided that.  At that point

15    they allowed all the claims, okay, and the commercial

16    success arguments were provided to show patentability of

17    the claims.  So, with a commercial success argument you

18    have to actually show that each of the elements of the

19    claim are contained by the product, not that all the

20    elements of the product are contained by the claims.

21    It's not the reverse.  Similar to why the independent

22    claim that was allowed cannot be argued to have, to be

23    limited to colors that are not gray in color, because if

24    you look at the product that was utilized to show

25    commercial success, it had an exterior gray color, and

1    nobody would rationally argue that the, that the patent

2    cannot be asserted against sensors that have a gray

3    color because we somehow disclaimed that.  Similarly

4    there was no, there was never an argument provided with

5    regard to the exterior shape of the electrically

6    insulative element.

7            So after the claims were allowed and the

8    patent office said these dependent claims that all you

9    said was that they're dependent upon allowable

10   independent claims, we don't buy that argument.  You're

11   either going to have to provide more information, more

12   legal argument or something.  We said we don't need

13   them.  We already have independent claims that are broad

14   enough that cover any shape, any color, any gas, because

15   they're not limitations of the claim themselves.

16           So, what we did is we said, you know what, we

17   don't need those claims, and we just did what the patent

18   office said, which is they came back to us and said

19   since the claims of are different number at this point,

20   can you please cancel all the claims and renumber them,

21   from this number to this number.  And that is right,

22   just for your purpose of the slide, it's at the bottom

23   here, shows you exactly what the patent office, it was

24   the examiner's request that we clean up the patent

25   numbering and cancel the claims that are allowed and

1   renumber them.  So that's basically the process that
2   took place.  Go ahead.  Go ahead, next one.
3           So, for the commercial success, I'm not sure
4   if your Honor wants me to mention why commercial success
5   was successful, obviously we have patents with a strong
6   presumption of validity at this point, but we'd be more
7   than happy to mention why if you'd like.
8           THE COURT:  If I have questions I will ask
9   them, but if you think it's important for me -- I think
10  I have an understanding of this from the briefing.  It's
11  up to you.
12          MR. NIEVES:  Then I'll just gloss over this
13  real fast, then.
14          THE COURT:  All right.
15          MR. NIEVES:  So for the commercial success,
16  some of the things that were considered by the patent
17  office to lead to commercial success was that the
18  invention of claims contained a product, which is one of
19  the things we mentioned.  The market price wasn't
20  decreased so that it was, you know, dollars less than
21  everybody else in the competition, that's why the
22  success was there.  The number of employees, there was
23  never one dedicated individual dedicated to marketing.
24  The company went from like six employees to 30.  So it's
25  not like there are hundreds of employees that were

1    trying to make this thing successful.  There was a huge

2    spike in sales right after the introduction, and the

3    market just soaked it up and there was a high demand.

4    Go to the next one.

5                 So, at this point after the prosecution has

6    taken place you've got claims that are of different

7    scope.  And on top of that you've got some claims that

8    are substantially identical to what was in the original

9    patent, meaning that, let's say you had dependent claim

10   number four in the original patent, and dependent claim,

11   dependent claim number one.  What we now have is an

12   independent claim that covers claim number four and

13   number one.  That's basically it.  Word for word the

14   exact same language.  So that shows that those claims

15   are substantially identical, if not identical, because

16   remember again, the patent office asked us to renumber

17   the claims.

18                 Then you've got some claims that are amended

19   that have some additions added to them, and then you've

20   got other claims that are new claims that are supported

21   by the original specification.

22                 THE COURT:  But the limitations of the claims

23   that you dropped.

24                 MR. NIEVES:  Yes.

25                 THE COURT:  Did you actually argue that your

1    independent claims cover those limitations?

2            MR. NIEVES:  No, and that's a very good point.

3    In the prosecution itself the independent claim makes no

4    reference at all with regard to shape in any way, shape

5    or form.  So what -- sorry, but what actually

6    happened --

7            THE COURT:  No pun intended.  So you just said

8    that we don't need to pursue this.

9            MR. NIEVES:  We don't need to proceed with

10   these dependent claims, and it wasn't just a claim on

11   shape, there was a claim on argon gas and others,

12   because we don't need them.  We have independent claims

13   that are broad.

14           Now, if you look at other, and Mr. Lucic is

15   going to speak about this when we get specifically into

16   the electrically insulative portion, but just to give a

17   preamble I guess you would say, if you look at other

18   cases like the Rheox case, which your Honor is kind of,

19   I don't want to say what you're alluding to, but there's

20   a lot of case law in that area, and in those cases you

21   specifically have independent claims that talk about a

22   limitation.  In that case it talks about calcium

23   phosphate, and then dependent claims that talk about

24   derivatives of it, then the independents amend it to get

25   rid of that calcium phosphate and get only one

1    derivative, and the dependent claims are removed, and on

2    top of that there's legal argument that the patent

3    office thinks we're different from the patent office,

4    the reason why we're different is because we're going

5    after non-soluble calcium phosphate, they're going after

6    water soluble.  We don't want that.  In fact, this is

7    the water solubility range of what we're going after.  I

8    mean, it's so explicit there's no, it's so clear that

9    there's a disclaimer with regard to those embodiments.

10              In our case we actually provided the

11   commercial success argument for all of these claims, and

12   we did not address the dependent claims.  All we did for

13   the dependent claims is said they depend from allowing

14   independents claims, that's it, and then when the patent

15   office says, well, we disagree with you, our choice at

16   that point was to either go through an appeal process,

17   which is going to cost us over a hundred thousand

18   dollars more because we've got three patents that we're

19   going to have to appeal to go after a dependent claim

20   which makes no sense, including another year of

21   prosecution that would have likely have taken place, so

22   it just didn't make a lot of sense to start this whole

23   process over, because keep in mind, SignalQuest is a

24   small company with less than 30 individuals, not a large

25   company.

1              THE COURT:  No, but I really can't evaluate

2      your motives.

3              MR. NIEVES:  Absolutely.  Absolutely.  So

4      that's basically the summary of where we are.

5              THE COURT:  Let me ask this question.  So are

6      you going to jump into the different terms now?

7              MR. NIEVES:  Yes.  Mr. Lucic.

8              THE COURT:  Let me just do this, then, just

9      because you've laid out some foundation.  Do you want to

10     address that at all, in other words --

11             MR. TROP:  Yes.

12             THE COURT:  Without getting into any of the

13     terms, if you want to just address some of the points.

14             MR. TROP:  Just at a high level I might need

15     to put something in the record.  There's some discussion

16     here as well as I can understand it about what happened

17     in interviews with the examiner.

18             THE COURT:  Yeah.

19             MR. TROP:  These were largely not made of

20     record, therefore this would be entirely extrinsic

21     evidence and really isn't considerable in claim

22     construction.  If you didn't put it in the record and

23     you were supposed to, you can't come into court now and

24     argue all that.

25             THE COURT:  I accept that.

1          MR. TROP:  So I just need to make that point

2    clear.  And then on the other issue, that's clearly

3    extrinsic evidence and they never said they were relying

4    on that.

5          THE COURT:  Point taken.

6          MR. NIEVES:  One thing to address that, it

7    actually is in the record.  If you look at the

8    prosecution history in our response, it specifically

9    says in accordance with the request of the patent

10   office, we did the following.  So it actually is in the

11   prosecution history.

12         THE COURT:  All right.  Mr. Lucic, do you have

13   a preferred order?

14         MR. LUCIC:  The order that we're going to take

15   these and I think it's the order that they appear in the

16   briefs, so I think we're doing them sequentially.  There

17   are a few categories of claims, and there are a number

18   of claims where we are going to talk about them in what

19   I think of as sort of traditional Markman terms,

20   discussing what the actual words mean in the context of

21   the claims themselves and how they're used.

22         There are a number of claims that are, a

23   number of terms that the defendant claims are

24   indefinite, SignalQuest says plane and ordinary meaning.

25   And then there is the discussion of the effect of the

1   reexamination on whether it includes this additional

2   limitation in the, with respect to the electrically

3   insulative element.

4           Just to orient ourselves here in terms of the

5   terms that we're going to be talking about.  The major

6   terms that we are going to discuss involve of course the

7   electrically conductive element, the first and second;

8   the electrically insulative element is 140; the

9   conductive weights which really aren't an issue, but you

10  need to understand how those work.

11          Within that we also, we have the proximate

12  portion -- whoops, keep it back on that last slide.  The

13  proximate portion in which there is a diameter D1.  The

14  distal portion, in which there is a diameter D2 that

15  we'll be discussing.  We have the, and the proximate

16  portion and the distal portion of the second

17  electrically conductive element are the same.  Those two

18  things are exactly the same.  You have the proximate end

19  of the electrically insulative element.  The proximate

20  -- the distal end of the electrically conductive

21  element.  And then we'll talk about the specifics of the

22  distal portion, the features of the distal portion, the

23  cylindrical lip and those things in their general

24  context.

25          So, the first term that we are going to deal

1    with is the term diameter, and --

2              THE COURT:  You say the distance through the

3    center of something from one side to the other.

4              MR. LUCIC:  Yes, so --

5              THE COURT:  And their point is any diameter.

6              MR. LUCIC:  They're saying any diameter.  The

7    first thing that we would note is defining something

8    with itself isn't really providing a definition, and

9    what in effect the defendants are trying to do, they're

10   trying to add limitations into a term where there's no

11   need to add the additional language, whether it's inside

12   or outside.

13             In the context here, we have diameter, we're

14   using the diameter in the simple geometric --

15             THE COURT:  Here's what I want to know about

16   this.  What difference does it make whether this is

17   measured from an internal point or an external point?  I

18   mean, what difference does it make to this invention as

19   conceded by the ordinary person in the art.  I mean,

20   what's the, I've got to figure out, I understand you

21   disagree, I'm trying figure out what difference it

22   makes.

23             MR. LUCIC:  In our view, your Honor, it

24   doesn't make any difference because the claim terms tell

25   you what you're talking about.  I mean, there really

1  isn't any issue with respect to what the term, you know,

2  what the term diameter is referring to because when we

3  use the term broadly, as we do in its geometric sense,

4  we say, you know, from a geometric sense the diameter is

5  the, you know, is the distance through the center of it.

6  Right?

7              THE COURT:  Yup.

8              MR. LUCIC:  And then when you go to the actual

9  claim language, it tells you what diameter you're

10  referring to.  So you have a diameter of the proximate

11 portion, D1, and you know that that diameter is larger

12 than the diameter of the distal portion which is D2.  So

13 it tells you essentially --

14             THE COURT:  Tells you which diameter you're

15 talking about.

16             MR. LUCIC:  It tells you what you're talking

17 about.  It tells you, basically it's telling you that

18 the distal portion of the electrically conductive

19 element is bigger than the proximate -- the diameter of

20 the proximate portion is bigger than the diameter of the

21 distal portion of the electrically conductive element.

22 It tells you which is which.  It tells you where to

23 start and it tells a person skilled in the art what

24 you're looking at.

25             MR. NIEVES:  One other point, your Honor, if I

1    might, is that you asked is it important to the

2    invention at all.  In this specific case those diameters

3    are very important to the dimensions of everything for

4    how they fit together.  If somebody is talking about a,

5    quote, unquote, interior diameter, they'll state

6    interior diameter.

7              THE COURT:  Or first and second.

8              MR. NIEVES:  Yeah, or first and second, or if

9    they're talking about outside diameter, they'll say

10   outside diameter.  The term that they requested for

11   interpretation is diameter.  What's a diameter.  If

12   somebody wants to qualify, they can throw a word in

13   front of it.  There's no confusion as to what the term

14   diameter means.

15             THE COURT:  I can't imagine -- well, I have

16   difficulty imagining diameter meaning anything different

17   than what I learned in tenth grade geometry.  It doesn't

18   seem to be -- you don't seem to really disagree as far

19   as I can tell.

20             MR. NIEVES:  The only clarification I might

21   add to that.

22             THE COURT:  Yes.

23             MR. NIEVES:  Is that if you look at, with due

24   respect, the defendant's argument with regard to it

25   being an internal/exterior diameter, they're referring

1    to D3.   Nowhere in the specification of the claim or

2    anything does it specifically say that D3 is an inner

3    diameter of anything.   D3 is a diameter of the gap.

4    It's not referring to the diameter of the distal portion

5    of an electrically insulative element.   It's

6    specifically talking about the gap.   Again, it's from

7    one point to the other point of that gap.   When you're

8    talking about the diameter of the distal portion, you're

9    talking about one point to the other point through the

10   center of the distal portion.   If somebody wants to

11   refer to inner diameter, they can state inner diameter.

12   The definition diameter doesn't require --

13            THE COURT:   Well, when you get into the your

14   proposed definitions of first and second diameter, and

15   so you incorporate the word different, what does

16   different mean?   I mean, does different mean anything

17   besides the length of that diameter, the measurement of

18   that diameter?

19            MR. NIEVES:   The terms first and second are

20   utilized in the claim merely for purposes of making sure

21   that you have antecedent basis, so if I say the distal

22   end of the --

23            THE COURT:   But inherent in first and second

24   is that they are different.   No?

25            MR. NIEVES:   Well, if you're referring to a

1    diameter of the proximate portion and you're referring

2    to diameter of distal portion, then that differentiates

3    the two.  If I say the diameter -- I'd have to -- can I

4    pull up the claim language itself to show you how it's

5    used?

6            THE COURT:  Sure.

7            MR. NIEVES:  That will show you where it's

8    mentioned the first diameter and second diameter.  So,

9    as you said, it is referring to there being two

10    different diameters.  The definition of diameter is

11    still the same but it is showing you that they're not

12    the same diameter.

13            THE COURT: Your definition of first diameter

14    is that it's different from the second diameter.

15            MR. NIEVES:  It's a different diameter from,

16    right, different diameter from the first diameter.  The

17    second one is different from the --

18            THE COURT:  So what does the word different

19    mean?

20            MR. NIEVES:  You have to look --

21            THE COURT:  In this context what are you

22    proposing it means?  Does it --

23            MR. NIEVES:  It's not a different -- the term

24    diameter is not different.  It's referring to in a

25    claim.  Let's say in a claim I talk about multiple cars.

```
1    I say there's a first car, a second car, a third car, a
2    fourth car.  Let's say they're all Volvos, all right?
3    Every single one of them are green.  Every single one of
4    them is exactly the same.  I have to differentiate that
5    each one is different, otherwise when I say the Volvo,
6    you don't know in a claim interpretation if I'm talking
7    about the first, the second, the third or the fourth.
8              THE COURT:  But could the first and second
9    diameter, which you want me, I think you're trying to
10   say you have to understand them as being diameters of
11   two different things, could they be the same
12   measurement?
13             MR. LUCIC:  No.
14             THE COURT:  No.
15             MR. NIEVES:  Let's go to the claim language.
16   That will make it easier.  So if there's a first
17   electrically conductive element having a first diameter
18   on a proximate portion of the first electrically
19   conductive element, a second diameter on a distal
20   portion of the first electrically conductive element --
21             THE COURT:  When you read, you have to read
22   slower for the reporter.
23             MR. NIEVES:  I apologize.  So, a first
24   electrically conductive element having a first diameter
25   on a proximate portion of the first electrically
```

1   conductive element, and a second diameter on a distal

2   portion of the first electrically conductive element

3   where the second diameter is smaller than the first

4   diameter.

5            So, the claim itself addresses whether

6   diameters are different.  The term diameter does not

7   differentiate whether or not a diameter a different.

8   The claim term itself does.  So in the use of a claim it

9   tells you the first diameter of the proximate portion is

10  larger than the second diameter, which is the diameter

11  of the distal portion.

12           THE COURT:  Okay.

13           MR. NIEVES:  But the term is consistent.

14  Diameter always means the distance from one point to

15  another through the center.

16           THE COURT:  Understood.

17           MR. LUCIC:  Yes, so, again, and you see the

18  claim language here, and again, the language is

19  consistent throughout, through the specification as

20  well.

21           So, we sort of jumped ahead here a little bit

22  to the first and second.

23           THE COURT:  Yes.

24           MR. LUCIC:  So again, the argument is

25  essentially the same, and the differentiation is based

1   on the claim language and the language of the

2   specification itself which is consistently throughout.

3           So, the next term is the term electrically

4   conductive element.

5           THE COURT:  Let me hear from Mr. Trop

6   regarding diameter if you don't mind.

7           MR. TROP:  I'm still not sure where we're

8   differing.  I thought we agreed on this.  I'm trying to

9   broaden that term and they seem to accuse me of trying

10  to narrow it.  I don't want to narrow it.  I want it

11  nice and broad.  I want it to be any diameter, inside

12  outside, diagonal, across, side to side, and it sounds

13  like that's what they're saying, so I don't really know

14  exactly what the difference is between what other --

15          THE COURT:  Run through those options again, I

16  mean, across, side to side.

17          MR. TROP:  Yeah, because they point out you

18  can have a square shape, in their briefs they point out

19  you can have a square shape, then the diameter would be

20  side to side, up and down, left to right, and across,

21  diagonal, and up and down.

22          THE COURT:  Which would be a different

23  diameter.

24          MR. TROP:  Right.  There's three different

25  diameters.  And their claim doesn't say, oh, only

1   diameters for this or only diameters for that or only

2   inside diameters or only outside diameters.  So, I don't

3   know that they disagree.  I think they agree with me and

4   they think I'm trying to narrow their claim some way,

5   I'm not.  I'm trying to just say diameter means

6   diameter, any diameter.  Don't come back and tell the

7   jury, oh no, a diameter is only outside diameter.

8          THE COURT:  All right, you can move on.

9          MR. LUCIC:  So, the, in the context of, again,

10  the claim, we've talked about this, the electrically

11  conductive element, and the definition that we proposed

12  again is a very straightforward --

13         THE COURT:  Before we jump into electrically

14  conductive element, let me move back to one point Mr.

15  Nieves made.  Your point that whenever a diameter is

16  referenced, it's referenced with respect to proximate,

17  distal, it's placed somewhere within the device, right?

18  If that's the case, why do -- why does the word

19  different need to be incorporated into the definition?

20  If it's always clear which diameter we're talking about,

21  why is it necessary to incorporate this idea that it's

22  different from the second and second is different from

23  the first?

24         MR. NIEVES:  The only reason is because the,

25  the only term that first and second is utilized is in

1   the claim itself.  The term diameter alone is
2   consistent, but in the claim term itself it says the
3   first diameter and the second diameter, so clearly it's
4   specifying that the first diameter is a different
5   diameter than the second diameter, that's really it.
6   Otherwise they would just say --
7           THE COURT:  But there's always something else.
8   I thought you were saying before whenever the word
9   diameter is used, it's used in reference to something in
10  particular.
11          MR. NIEVES:  Absolutely.
12          THE COURT:  Distal, proximate, or some part,
13  right?  So, I don't know why it would be necessary to go
14  further than that.  If there's always a qualifier,
15  always an adjective or some kind of qualifier, I don't
16  know why --
17          MR. NIEVES:  Agreed.
18          THE COURT:  Because we don't want to
19  incorporate things, right, into the term that don't need
20  to be there.
21          MR. NIEVES:  Absolutely.
22          THE COURT:  But you think it needs to be
23  there, and I guess I need to know why.
24          MR. NIEVES:  No.
25          MR. LUCIC:  No.

1          MR. NIEVES:  The defendant has asked for the

2   interpretation of the terms first and second diameter.

3   We were just looking for the term diameter.  That's it.

4          THE COURT:  Okay.

5          MR. NIEVES:  That was one of the issues that

6   was raised.  Is it internal or external or --

7          THE COURT:  So your definition of first and

8   second is more of a reaction to their request.

9          MR. NIEVES:  That's pretty much it.  You know,

10  what's the difference between a first and second

11  diameter.  Well, in the claim they're different

12  diameters, that's really it, because if you look at the

13  claim --

14          THE COURT:  Basically your difference between

15  the first diameter and second diameter is that they're

16  not each other.

17          MR. NIEVES:  Pretty much.

18          THE COURT:  All right.

19          MR. NIEVES:  Because as we look at the term,

20  we always look at the claim first, right?  And as we

21  look at the claim, the claim specifically says that the

22  first diameter is the diameter of the proximate portion,

23  and the second diameter is the diameter of the distal

24  portion.

25          THE COURT:  That's really the bottom line

1    here.  I agree with that much.  Do you disagree with

2    that, Mr. Trop?

3              MR. TROP:  No, I only raised first and second

4    because of diameter.  I'm just trying to get one

5    definition for diameter that applies every place

6    diameter came up with, I don't really care about first

7    and second.

8              THE COURT:  Okay.  Electrically conductive

9    element, is that where you want to go?

10             MR. LUCIC:  Yes, sort of going down in the

11   order of the brief here and we're going to wind up

12   jumping around a little.  We will do the best we can and

13   restack the slides for everybody at the end of the day.

14             Electrically conductive element, again, the

15   SignalQuest definition is pretty straightforward simply

16   saying that --

17             THE COURT:  I don't mean to be impolite, but

18   my screen is over here.

19             MR. LUCIC:  No, no, understood.  So our

20   definition, the definition that we're proposing is an

21   element that's able to conduct electricity.  The

22   defendant says any object that conducts electricity

23   across the object; all parts of the element need not be

24   entirely conductive.

25             It's a very similar kind of argument here

1    because what we're proposing is the plain meaning of the

2    term, an element that's able to conductive electricity.

3    Nobody disagrees with that concept.  What the defendants

4    are trying to do is add additional language that's

5    unnecessary, that is not part of anything that's based

6    on the language that's used here, the language of the

7    claim or, you know, any language in the rest of the

8    patent, adding this notion that, well, it may not be

9    entirely conductive, you can have different parts of it.

10   If it's not entirely conductive, then it's not the

11   electrically conductive element.  Plain and simple.

12           THE COURT:  Would a person of ordinary skill

13   in the art, would that person understand it, that the

14   element must be conducted of a hundred percent of

15   conductive material, that it has to be?

16           MR. LUCIC:  I would -- in the context in the

17   way it's written, yes, I mean the element itself, what

18   we're talking about, if you're saying the electrically

19   conductive element, if the language were somehow

20   different, if it were somehow a plug that contains a

21   electrically conductive element or something like that,

22   there would be some change to the language.  But when

23   you're saying this element is electrically conductive,

24   from just a grammatical sense your understanding is that

25   yes, this element is electrically conductive.

1          THE COURT:  But that's not the same question.

2     The question is whether it would have to be understood

3     to be entirely, entirely constituted of conductive

4     material.  Now, their point is that it must not be, and

5     I don't know -- that's one thing.  I don't know it

6     follows you saying it must be.  Could it be either?

7          MR. NIEVES:  It's a very good question.  So, I

8     think to answer the question you look at the spec.  If

9     there's any confusion with regard to the claim, you go

10    to the spec.  The spec makes it very clear.  It tells

11    you, and we've highlighted it for your Honor where it

12    refers to the first end cap, it says that it's

13    constructed from a composite of high conductivity and

14    there's low reactivity metals, a conductive plastic or

15    any other conductive material.  It's conductive.

16    There's no description.  There's no figure.  There's

17    nothing that talks about a little strip not being

18    conductive or plastic part around it with only a little

19    piece of it being conductive.  It's called a conductive

20    element.  We're kind of complicating, what's essentially

21    happening is they're trying to add different flavors of

22    things that aren't described, and what that essentially

23    does is it opens up additional prior art, that's really

24    what happens.  But we now talk about an insulative plug

25    that has only one portion of it that's conductive, but

1    we call the whole thing electrically conductive.  Well,

2    that opens up a whole new world.

3             THE COURT:  So that's why it matters.  My

4    question was why does it matter.

5             MR. NIEVES:  That's one of the reasons why,

6    because, your Honor, there is no disclosure in this fact

7    or the figures or anywhere that it talks about any part

8    of the electrically conductive element being

9    nonconductive.  By its nature if there was a

10   nonconductive portion of the electrically conductive

11   element that wasn't electrically conductive, then it

12   wouldn't be electrically conductive.

13            THE COURT:  Do you have anything you want to

14   say, Mr. Trop?  What do you want to say about this term?

15            MR. TROP:  Sure.  You may remember, judge,

16   this is very similar to the last construction hearing

17   where we had this issue where we're trying to read the

18   word entirely in this claim.  What they're trying to do

19   here --

20            THE COURT:  I must confess I don't remember

21   much about that.

22            MR. TROP:  So they're trying to read entirely

23   into every word.  When he showed you that quote, the

24   problem with the quote is it just says it's conductive.

25   It doesn't say it's entirely conductive.  It just says

1    it's conductive.

2              THE COURT:  But you're saying it must not be

3    entirely, that's the problem.

4              MR. TROP:  No, no, no, no, no.  I'm saying it

5    doesn't have to be entirely made out of conductive

6    material.  For example, a wire --

7              THE COURT:  Oh, you're right.

8              MR. TROP:  The wire in your walls, it's got an

9    insulative sheath with a wire through it.  Nobody

10   skilled in the art is going to say I don't know how your

11   plug works, nothing in that wall is electrically

12   conductive.  It is electrically conductive.  It's

13   partially electrically conductive, it's not entirely

14   electrically conductive.  But every day usage is

15   something can be electrically conductive if it conducts

16   electricity.  It doesn't have to be entirely

17   electrically conductive.

18             MR. NIEVES:  Your Honor, may I address that

19   statement or --

20             THE COURT:  Let me just finish my thought

21   here.

22             MR. NIEVES:  Absolutely.

23             THE COURT:  But that's a narrowing.  No?

24   You're shaking your head.

25             MR. TROP:  No, broadening.

1          THE COURT:  Aren't you asking me to

2    incorporate a narrowing interpretation?

3          MR. TROP:  No, no.  My word I'm adding, so

4    they're criticizing --

5          THE COURT:  That's your point about

6    broadening.

7          MR. TROP:  I'm trying to broaden, your Honor,

8    and he's absolutely right, I'm trying to broaden.  And

9    it seems like they're arguing I'm trying to narrow

10   because I'm adding a word, but I'm adding a word to

11   clarify how broadly the claim really is.

12         THE COURT:  We've been looking for authority

13   for the idea that we can import a narrowing construction

14   or a limitation with a claim that is silent, but you're

15   saying basically it's a broadening.

16         MR. TROP:  That's right.

17         THE COURT:  Is there an authority for that

18   proposition?

19         MR. TROP:  Your Honor, it's in the prior claim

20   construction.  We cite two cases that say when you have

21   a noun, you can't add an adjective to it, so you can't

22   say it has to be entirely, they're trying to read the

23   word entirely in.  You can't add that adjective where

24   where there's a narrowing.  I think you cited the

25   Maricosa (ph) case and another case, and I know it's a

```
1   little counterintuitive that I'm putting a word in and
2   saying it doesn't have to be entirely, but it's actually
3   broadening their claim.  So now it would cover not only
4   things that are entirely conductive material, but if it
5   conducts electricity but it has some insulative parts to
6   it and still conducts electricity, it's covered.
7           THE COURT:  All right.  Mr. Lucic, so you
8   wanted respond?
9           MR. NIEVES:  If I might, your Honor, thank
10  you.  Just one other comment for that.  First, one of
11  ordinary still in the art is looking at a coil
12  essentially or basically what's referred to as an
13  insulated copper wire.  The electrically insulative
14  portion is the copper portion of it, not the other
15  portion which is identified as electrically insulative,
16  so it wouldn't be a conductive element.
17          The other part of it, as you just heard, part
18  of the rationale for seeking to make it cover
19  electrically insulative portions is because then you
20  open up a whole other world of prior art.  Again,
21  there's nothing in the specification that talks about an
22  embodiment that does this.  There's no drawings that do
23  it.  That's basically what it is.
24          THE COURT:  I understand your second, but I
25  want to move on here, I understood your second point.  I
```

1  didn't understand your first point distinguishing

2  between the coil.  What are you trying to tell me?

3          MR. NIEVES:  So basically let's say somebody

4  did have a copper wire that had insulation on it, right,

5  so we use those all the time in our homes when we're

6  talking about wiring.  So if somebody splices it, you

7  look at it, the electrically conductive element is the

8  copper portion, it's not the insulative element.  By

9  nature it's called an insulative element.  So somebody

10  wouldn't look at the whole thing and say this is an

11  electrically conductive element.  They say, well, where

12  is the electrically, as an electrical engineer I can say

13  it as well, where's the electrically conductive element.

14  The copper portion.  Where's the electrically insulative

15  portion.  The insulative portion.  So there are two

16  different portions.  You don't look at the whole thing

17  and say this is an electrically conductive element;

18  otherwise, when you hold it you get shocked by touching

19  it.  The whole thing is not electrically conductive.

20          THE COURT:  I see.  What's next, Mr. Lucic?

21          MR. LUCIC:  Cylindrical lip.

22          THE COURT:  Yup.

23          MR. LUCIC:  Okay.  Again, with respect to

24  cylindrical lip we proposed a definition that says that,

25  suggested it's a raised or extended piece along an edge

1    that is cylindrical in shape.  Again, we think that's a

2    fairly straightforward definition based on the language

3    itself, the language of the claim, and is supported by

4    the dictionary definition which says a raised or

5    extended piece along an edge.

6            THE COURT:  Let me just get a clarification on

7    one thing before I do the rest.  Because the defendant's

8    proposed construction is circular cylindrical hollow

9    portion; right?  Portion of what?  I want to, you know

10   --

11           MR. TROP:  Portion of the, I always get distal

12   and proximate confused.  I think it's the distal

13   portion.

14           THE COURT:  Continue, please.

15           MR. LUCIC:  So, yeah, the defendant's

16   definition circular cylindrical hollow portion.  First

17   of all, using the word cylindrical to define cylindrical

18   doesn't help you, and the term circular cylindrical is

19   not necessarily the case.  What they're referring to as

20   circular cylindrical is a right circular cylinder.

21   Cylinders can be shapes other than a circle.

22           Go back to the previous slide.  So, the notion

23   here that, and we simply don't understand what they're

24   referring to the hollow portion, that doesn't seem to

25   make any sense with respect to a lip.  A lip is

1   something that is raised, extended and, you know, you

2   think of the human lips --

3           THE COURT:  I thought of it as hollow as an

4   extension of the cylinder, I guess, I don't know.

5           MR. LUCIC:  Well, it describes, it describes a

6   feature of the distal portion of the -- and if you go

7   ahead two slides.  You know, it describes the, you know,

8   the shape of what the distal portion of the electrically

9   conductive element looks like.  And you can sort of see

10  it is the raised portion of it.  It's not the hollow

11  portion.  It's not the hollow of this.  The cylindrical

12  lip is the raised portion of the distal portion itself.

13          THE COURT:  124?

14          MR. LUCIC:  No, 122, your Honor, the entirety

15  of it.

16          THE COURT:  122.  Okay, yup.

17          MR. LUCIC:  124 is just one of the surfaces,

18  your Honor.

19          MR. NIEVES:  Your Honor, just to expand upon

20  what you're alluding to.  So 124, 130 and 126, those are

21  the three portions of the lip itself.

22          THE COURT:  124.

23          MR. NIEVES:  124.

24          THE COURT:  130.

25          MR. NIEVES:  Correct.

```
 1              MR. LUCIC:  And 126.

 2              THE COURT:  I'm lost, I can't find 126.

 3              MR. NIEVES:  126 is underneath 124.

 4              THE COURT:  Oh, yeah.

 5              MR. NIEVES:  So, that's basically a lip.  When

 6    you're trying to describe it in a patent you have to

 7    give it some kind of term.

 8              THE COURT:  But that's the whole distal

 9    portion of the electrically conductive element; right?

10              MR. LUCIC:  That's the lip portion of it.

11              THE COURT:  The lip portion.

12              MR. NIEVES:  Yeah, it's the lip portion of it,

13    because when we get to proximate and distal --

14              THE COURT:  I understand in a common sense

15    sense why that means hollow, I think I get that, but --

16              MR. NIEVES:  But the only portions that are

17    associated with the lip do not include element 132,

18    which is the, you see that inner surface there?

19              THE COURT:  Yes, I do.

20              MR. NIEVES:  So all you have for the lip

21    portion is 124, 130, 126.  The lip, the extended

22    portion, it does not include 132.  The distal portion

23    which is 122 which Mr. Lucic will go into in more detail

24    going forward, includes 132.  132 is not included in the

25    lip because by nature a lip only extends out.  It
```

1    doesn't include the whole mouth.  This is the top lip,

2    this is the bottom lip.  It doesn't include your entire

3    mouth.  I don't want to get too graphic.

4            MR. LUCIC:  This is the language from the

5    specification, you know, it tells you exactly what

6    you're -- what's being talked about here.  As shown in

7    figure two, you know, the top surface 124, the outer

8    surface 130, and bottom surface 126 of the distal

9    portion form a cylindrical lip of the first end cap 110.

10   So, that describes exactly what you're talking about,

11   you know, and it goes on to say that, you know, in

12   addition, the first end cap and the second end cap may

13   be square in shape or they may be any other shape, so.

14           THE COURT:  Back to stupid question time,

15   obvious question time.  When manufactured, okay, this

16   electrically conductive element, whether or not it's a

17   hundred percent conductive material, that's manufactured

18   as one unit, right?  Like that's not parts that are

19   assembled, that's one whole unit.

20           MR. LUCIC:  Right.  I mean, that's the -- the

21   successful part, or one of the successful parts of this

22   invention is how easy it is to manufacture, you know,

23   and essentially the, you know, once you understand how

24   to manufacture that end cap, that electrically

25   conductive element, the rest of it simply flows directly

1    from that.

2         MR. NIEVES:  Just to complete that thought,

3    your Honor.  The patent doesn't speak towards the

4    fabrication process of the first electrically conductive

5    element.  So we just, just for the record, we didn't

6    want to say that we are saying that this must be molded

7    as one unit.  It could have a proximate portion and a

8    distal portion that are --

9         THE COURT:  That are assembled or something?

10         MR. NIEVES:  Yeah, they are soldered together,

11    then it's fully electrically conductive, right, because

12    solder is electrically conductive.  So, I just didn't

13    want it to seem like we were saying that.

14         MR. LUCIC:  Okay.  So, I think the next

15    discussion is --

16         THE COURT:  I want to stay on this for a

17    minute.

18         MR. LUCIC:  Okay.

19         (Pause.)

20         THE COURT:  You're describing the lip as an

21    extension, okay, but don't you also describe the entire

22    distal portion of the element as an extension?  I mean

23    even 132 on the diagram that you show me of cylindrical

24    lip, you have it labeled as -- well, it's the diagram

25    we've been looking at the whole time, 132 is also an

1    extension, is it not?

2            MR. NIEVES:  132 is the inner surface.  The

3    description does talk about the distal portion of the

4    first end cap being an extension of the proximate

5    portion, so you're talking relative to what you're

6    referring to.  So, if I say the distal portion is an

7    extension of the proximate because the base that we're

8    talking about is the proximate portion, so the answer to

9    your question is yes.  Similar to how you have a bat.

10   The bat has a handle, an extension of the end of the

11   bat, and then there may be another portion that's a

12   further extension.  You could have different types of

13   extensions.  So, in this case you're starting with the

14   proximate portion in the spec, and it says the distal

15   portion of the first end cap is an extension of the

16   proximate portion.  And then the cylindrical lip, it

17   talks about the top surface, talks about the outer

18   surface, and it talks about the bottom surface as the

19   lip portion, but that doesn't include --

20           THE COURT:  So, your point, though, is it's

21   got to be an extension relative to something.

22           MR. NIEVES:  To something.

23           THE COURT:  So, under your construction must

24   124 and 130, right, the raised portion taken together,

25   they must be cylindrical in shape.  What about 132, the

1    surface that is an extension of.  What's 50        11

2    the extension relative to?  Must that be cylindrical as

3    well?

4            MR. NIEVES:  So, 132 is a flat surface.

5            THE COURT:  Right.  Must that be cylindrical

6    or round or anything in particular, or must only the lip

7    which I understand as being 124, 130, be cylindrical

8    shaped?

9            MR. NIEVES:  Well, I think two things are

10   important here.  One is with regard to shape, again,

11   cylindrical does not mean circular.  So you're referring

12   to either circular or square or octagonal, correct,

13   because --

14           THE COURT:  It's an important clarification,

15   yeah.

16           MR. NIEVES:  It doesn't have to be circular.

17   In fact, the specification comes right out and says that

18   the electrically conductive element may be circle,

19   square or any shape.  So there is no specification, no

20   specifying that it must be circular.  Cylindrical does

21   not mean circle.  Those are not synonymous.

22           Now, I'm going forward to address your

23   question, your Honor.  If in fact the cylindrical lip

24   were, let's say square, then by nature the internal

25   portion will be square.  If it was circular, then the

1    internal portion would be circular.

2            THE COURT:  It's got to be the same.

3            MR. NIEVES:  It would be the same because --

4            THE COURT:  I'm just asking, is it necessarily

5    the case, and you tell me it is.

6            MR. NIEVES:  Right, based on what the shape

7    is, by nature of the term, cylindrical shape does not

8    mean that it's circular.  Again, cylindrical could be

9    square, it could be octagonal, it could be circular, it

10   could be any shape, and the specification specifically

11   says, we cited that for you as well in this slide, your

12   Honor, where it says in addition, instead of being

13   circular the first end cap and second end cap may be

14   square-like in shape or they may be any other shape,

15   because its shape is not important.

16           THE COURT:  Once we resolve any ambiguity,

17   here's the bigger question I need to hear from everybody

18   about this, once we resolve any ambiguity about the

19   surfaces or the shape of the element, if those

20   ambiguities are resolved, is there any even need to

21   construe the term lip?  Because you're telling me it's

22   got to be the same; right?  It's got to be the same

23   shape.  So, what's ambiguous about, once you resolve any

24   ambiguities about the surfaces, what the extension is

25   relative to, there's no more -- what's left to construe,

 1   anything?  Is that not clear?
 2           MR. NIEVES:  I'm not following that, sorry,
 3   your Honor.
 4           THE COURT:  Well, this lip is an extension
 5   from something as you explained to me.
 6           MR. NIEVES:  Yes.
 7           THE COURT:  It's got to be an extension
 8   relative to something.
 9           MR. NIEVES:  Yes.
10           THE COURT:  If there's no ambiguity about the
11   surface from which the lip extends, is there anything
12   left to construe about the idea of a lip?
13           MR. NIEVES:  Right, right, and I get your
14   point.
15           THE COURT:  It's really more of a question for
16   you.
17           MR. NIEVES:  I think so.
18           THE COURT:  Do you understand my question?
19           MR. TROP:  Yeah, I'm not sure any of that is
20   all that clear in the claim, though, your Honor, and
21   mostly --
22           THE COURT:  Really, I understand your point.
23           MR. TROP:  My gripe is this definition is so
24   complicated I don't understand it.  And he's picking on
25   circular.  If I'm wrong about circular, I'll take

1    circular out.  But his construction, I don't know what

2    that is, extended, I don't understand what that is.  I

3    don't know what page he's talking about.  That's all my

4    gripe is.  It may be nitpicky, but I don't want to read

5    back to the jury and have the jury say we don't know

6    what in the world you're talking about.

7            THE COURT:  So you're not hung up on the idea

8    of circular at all really.

9            MR. TROP:  No.

10           THE COURT:  Okay.  I thought you were.

11           MR. TROP:  I might have been at one time, but

12   I think he's persuaded me that circular is unnecessary.

13   I'd take that out.

14           THE COURT:  All right.  That's fine, thank

15   you.  All right.  Mr. Lucic, you want to talk about

16   proximate and distal?

17           MR. LUCIC:  Yup.

18           THE COURT:  All right.

19           MR. LUCIC:  And I think the, because I think

20   there's going to be a whole series of discussions about

21   proximate and distal, but I think they sort of flow

22   together.  And again, the definition that we are using

23   is what we consider to be fairly straightforward

24   language, which the notion of proximate and distal are

25   simply the opposites of each other.  They are

1    demonstrating a relationship.  The defendants say it's

2    indefinite.  They don't understand it.  They don't

3    understand what we mean by proximate and distal, and

4    they don't offer a specific construction for that.  They

5    simply say we don't understand it and therefore you have

6    to determine that the terms are indefinite.

7            We, again, the dictionary definition supports

8    the definition that we have proposed, but the most

9    important thing here is looking at the actual claim

10   language itself, because the notion of what is the

11   proximate portion and what is the distal portion are

12   made very clear in terms of the claim language itself.

13   It easily tells someone skilled in the art what you're

14   talking about, where you start, which is proximate,

15   which is distal, and where each of these pieces go and

16   fits into the complete invention.  You can go to the

17   next slide.

18           Again, going back to the term diameter.  The

19   claim language makes it very clear that the diameter of

20   the proximate portion is larger than the diameter of the

21   distal portion.  And simply put, you're creating a, you

22   know, you're creating a piece with a larger diameter and

23   a piece with a smaller diameter.  The larger diameter is

24   the proximate piece, it's always the proximate piece;

25   the distal portion is the smaller piece opposite the

1  proximate portion, and you know that the diameter of

2  that is smaller.

3         The language of the claim is completely clear.

4  And again, I mean, remember, this is an omnidirectional

5  switch.  This is not something that is oriented in one

6  particular direction.  So, using terms of a left or

7  right or up or down or anything like that really is not

8  appropriate in a device like this.  Using the relative

9  terms proximate and distal within the context of the

10 claims itself makes it very, very, clear, you know, the

11 proximate portion has a diameter that's referred to as

12 the first diameter.  The proximate portion is outside

13 the electrically insulative element, you know, when the

14 invention is completely put together and the proximate

15 portion has a larger portion than the diameter of the

16 distal portion.

17         THE COURT:  And there are two proximate

18 portions, two distal portions.

19         MR. LUCIC:  Right.

20         THE COURT:  Because they're on each end of the

21 device.

22         MR. LUCIC:  And it's exactly the same.

23         THE COURT:  The distal portion is the part

24 into which the electrically insulative element fits.

25         MR. LUCIC:  Right.

```
1              THE COURT:  There are a lot of terms -- there
2     are terms in this claim that I don't understand -- well,
3     you've been trying to explain this to me why these are
4     significant differences I guess because of how much
5     prior art they will end up incorporating down the line,
6     right, but I just, there are several -- I don't
7     understand the significance of the differences you're
8     arguing.  I do find some of these more persuasive than
9     the other, but I find myself repeatedly saying what
10    difference does it make, what difference does it make.
11    And I hope I'm not doing anything that's in a clueless
12    dense non-insufficiently sophisticated way.  More just
13    even given what you're telling me, I'm not always
14    appreciating what difference it really makes.  So I keep
15    coming back to that, I know, but I don't mean to be
16    dismissive of what you're saying, but I'm not seeing the
17    significance of the different constructions being
18    advanced.  Go ahead.
19             MR. NIEVES:  There was only one other thing
20    that I was going to offer with regards to that.  You
21    notice that the electrically conductive elements are
22    essentially about the same.  So you notice the language
23    is consistent for both, and everything is basically --
24    the spec, the figures -- everything is consistent.  It's
25    just to make it run smooth.  So the, as Mr. Lucic is
```

1    going to go into next, he's going to go into the

2    proximate and distal ends if you're okay with that.

3            THE COURT:  Yeah.

4            MR. LUCIC:  Yeah, and again, the proximate end

5    and the distal end refer to, now, refer to the

6    insulative element, the piece as your Honor correctly

7    says into which the distal portions of the two end caps,

8    the two electrically conductive elements fit into the

9    electrically insulative element.  Again, I mean --

10           THE COURT:  Don't you mean fit on to?

11           MR. LUCIC:  Well, the distal portion fits into

12   the electrically insulative element.

13           THE COURT:  Okay.

14           MR. LUCIC:  Okay?  This is important --

15           THE COURT:  Yes, yes.

16           MR. LUCIC:  This is important because the

17   claim language here, because again, the defendants are

18   saying in this instance and to your point about why this

19   is important, the defendants are basically saying it's

20   too complicated, it's too indefinite, we don't

21   understand what this means, so somebody skilled in the

22   art wouldn't understand what you're talking about and

23   can't put this thing together.  Our view is it's

24   actually pretty straightforward how you put this thing

25   together.  You take the, this is the, figure 3 is the

1    figure showing the electrically insulative portion, and

2    the first side here, this is the proximate end where the

3    arrow is pointing, the proximate end of the electrically

4    insulative element, and this is the distal end over here

5    where the arrow is pointing of the electrically

6    insulative element.  How do you know?  Because the claim

7    language tells you which one is which.  The proximate

8    end of the electrically conductive element is the end

9    into which the first electrically conductive element,

10   the distal end of the electrically conductive element

11   fits in.  So you see D4 there.

12             THE COURT:  Yes.

13             MR. LUCIC:  That has to be, you know, about

14   the same diameter as the diameter of the distal portion

15   of the electrically conductive element.  It's got to be

16   slightly larger.

17             THE COURT:  Slightly so it fits.

18             MR. LUCIC:  Yeah, it's got to actually fit in

19   there, right?  And so whichever one you put the first

20   electrically conductive element into, that is the

21   proximate end of the electrically conductive element.

22   Whichever end you put the second electrically conductive

23   element into is the distal end, the end away from the

24   proximate end and opposite the proximate end.  And the

25   electrically conductive element, the distal end of the

1  second electrically conductive element likewise fits

2  into, you know, within that diameter D4.  It's a tube,

3  your Honor.  I mean, it doesn't make a difference, you

4  know, all you're simply saying is whichever one you put

5  the first one in, the other side is the distal portion

6  of the second one.

7           THE COURT:  And to be clear, when you say

8  tube, because this might be my laymen's ignorance

9  because I learned a little bit about cylindrical, tube

10  doesn't necessarily mean round; right?

11           MR. NIEVES:  That's correct.

12           THE COURT:  That's important, all right.

13           MR. LUCIC:  So, the claim language tells you

14  exactly what is what.  There's no mystery as to which

15  is, you know, where do you start, what do you do because

16  the claim language tells you specifically which one is

17  which.  Go to the next line.

18           Now, the terms proximate end and distal end

19  are contained within the claim language itself.  There

20  is no specification that that -- no language in the

21  specification which points out exactly what the

22  proximate end and distal end of the electrically

23  insulative element is.  And the suggestion has been

24  because it's only in the claim language, it doesn't --

25  that is insufficient.  The case law is very clear that a

1    satisfactory description in the claim or any other

2    portion of the originally filed specification is

3    sufficient.  If you have, if you describe in the claim

4    language what it is, that's sufficient.  The suggestion

5    was made in their responsive brief, your Honor, that

6    somehow because there was no specification that related

7    to that term, that somehow that that was inappropriate,

8    but the case law has made it clear that that's no longer

9    the case.

10            Okay, this is the actual claim language.  It

11   tells you exactly, you know, it says where the distal

12   portion of the first electrically conductive element

13   fits within the proximate end of the electrically

14   insulative element.  And the distal portion of the

15   second electrically conductive element fits within the

16   distal end of the electrically insulative element.  Very

17   straightforward.  There really is not any mystery here

18   as to what anyone is talking about, and when you see

19   everything put together in context, it's very simple.

20            THE COURT:  But it seems like the point --

21   because you're not really offering construction as it

22   goes to distal and proximate, but you seem to have a

23   point that these need to be measured from some type of a

24   central point; right?

25            MR. TROP:  That's one possibility.  The actual

1    definition of distal and proximate is that you have to

2    measure from a point of reference such as a central

3    point, a point of view, and when they give the

4    definition they just crop all that out and say one is

5    the opposite of the other.  But the fundamental problem

6    we've got is there is law.

7              THE COURT:  There's what?

8              MR. TROP:  There is law that says you can't

9    misuse terms in the specification.  You can't use them

10   contrary to their ordinary meaning unless you explicitly

11   define them in the specification.  And those cases don't

12   say, oh, you can fix it in the claims.  They say you've

13   got to do it in the specification.  Someone's got to be

14   able to read the specification and, okay, when you said

15   distal, you meant proximate; when you said proximate,

16   you meant distal.  You misused proximate, you misused

17   distal, you misused proximal -- you didn't actually use

18   proximal.  So you can't use these words wrong in your

19   specification, with one exception.  The patent law says

20   you can misuse them and use them contrary to their

21   ordinary meaning if you define it explicitly in the

22   specification, and this law that he's citing, it's out

23   of the manual for patent examining procedure, the form

24   book that examiners use.  It has nothing to do with

25   this.  There are Federal Circuit cases that say that,

1    they don't say, oh, it's okay if you try to make it

2    clear in the claim.  It doesn't matter if you make it

3    clear in the claim.  If you use the word wrong, and they

4    did, repeatedly throughout their patent, you had to have

5    an explicit definition that says distal means --

6                THE COURT:  So, two questions.  They use it

7    wrong in your view because they don't -- their

8    definition doesn't include a point of reference from

9    which proximate and distal are measured from.

10               MR. TROP:  No, no, it's because under any

11   ordinary definition the thing they call distal is really

12   proximal.  The thing they call proximate is really

13   distal.  And then when you get to the end, they say

14   anybody skilled in the art would know which end is

15   distal and which end is proximal.  I don't know which

16   one.

17               THE COURT:  In terms of this patent, give me a

18   definition, who is a person of ordinary still in the

19   art?

20               MR. TROP:  Your Honor, that, I'd love to tell

21   you, normally that's done by expert testimony, so.

22               THE COURT:  I consider you an expert, go

23   ahead.

24               MR. TROP:  Bachelor's degree in electrical

25   engineering or mechanical engineering and a few years

1   experience.  But the problem is, there is no definition

2   that says distal can be proximal and proximal can be

3   distal.  There's no definition they're ever going to

4   find.  The definition is of the ordinary meaning.  So

5   there's nobody out there skilled in the art that's

6   saying, well, I know the dictionary says this, but I'm

7   just not going to comply with that.

8            So they have their problems where they use the

9   words wrong, and the patent law has strict rules about

10  this.  It says you can use them wrong, but you've got to

11  tell everybody you did it in the specification.  They

12  admitted in their briefs and they admitted here today

13  they didn't do, they think they didn't need to, but they

14  did, and their patent is invalid.  Just to tell you why

15  it mattered, if you do that, the patent an invalid.

16           THE COURT:  All right, I know you have

17  something you want to say.

18           MR. NIEVES:  Yes.

19           THE COURT:  Let me ask you first.

20           MR. NIEVES:  Absolutely.

21           THE COURT:  Answer the question I posed to

22  adverse counsel.  Define the person of ordinary skill in

23  the art vis-a-vis the patent.

24           MR. NIEVES:  Sure.  The inventor would be a

25  perfect example.  An engineer, somebody who has worked

1    on this type of technology, worked on sensors would be

2    one of ordinary skill of the art.  The people at

3    SignalQuest, you know, Mr. Kelley is a perfect example

4    of one of ordinary skill in the art.

5              THE COURT:  What did you want to say?

6              MR. NIEVES:  So, I think maybe two things.

7    First, there's no confusion that proximate and distal

8    are opposites.  Everybody knows that.  Nobody can say,

9    well, if this thing is proximate and that thing is

10   distal, those can mean the thing.  Nobody is confused

11   about that.  There's nobody here who's thinking that

12   that's a problem.  So the next question becomes, two

13   things.  One is there's been six levels of examination

14   of this patent.  No one was confused during the original

15   prosecution, nor during a three-panel review of three

16   different patents looking at this language consistently,

17   because the same language is used consistently for the

18   electrically conductive element, electrically insulative

19   element.

20             THE COURT:  What's important about that is no

21   objection has been raised to it?

22             MR. NIEVES:  Well, I just mention that for one

23   point.  Obviously, your Honor, you can do what you wish.

24   But one important point is not once did anybody say this

25   term is confusing, it's indefinite.  That's the

1   rejection that's used by the patent office, which could

2   have been used because the language is used everywhere.

3           THE COURT:  That was my question.  Should we

4   have expected it to come up if there was a problem?

5           MR. NIEVES:  We should have expected it to

6   come up because there was not only three levels of

7   review of the spec and claims during the original

8   prosecution, but we went through a long reexamination

9   process on top of that with a three-person panel with

10  over 30 years of experience in this area and with patent

11  review.  They would have nailed it, especially since the

12  term is everywhere.  Somebody would have come out and

13  said, I just don't understand this.  And the review,

14  when you're looking at this, by looking at these terms,

15  do I not understand, when I look at the terms in the

16  claims do I not understand it.  Nobody can honestly look

17  at this and say I don't get it.  I mean, this is so

18  simple.  I mean, it says the proximate portion has a

19  large diameter.  The distal portion is the opposite.  It

20  specifically says it's the opposite.  It shows you it's

21  the opposite.  So there's no confusion on that.  So the

22  terms proximate and distal are used with another term.

23  So there's a proximate portion, a proximate surface, a

24  proximate end.  Distal portion is always the opposite.

25  Distal end is always the opposite, distal surface is

1   always the opposite.  But there's really no confusion on

2   that.  And when you look at it in the claim, it's very

3   clear in the claim.

4           THE COURT:  All right.  What's next, Mr.

5   Lucic?

6           MR. LUCIC:  Okay.  Get to distal, equal in

7   dimension.  Okay.

8           THE COURT:  Like or alike in measurable extent

9   of some kind, such as length, breadth, depth, or height.

10   That's your definition.

11          MR. LUCIC:  And looking at the two components

12   of that term, equal, you know, and dimension.  And

13   again --

14          THE COURT:  And I guess that's my question.

15   Which is it?  Where's the emphasis?

16          MR. LUCIC:  Well, I mean, the term itself from

17   the, the language of the term itself, you know --

18          THE COURT:  What's the dispute over here?  Is

19   the dispute over equal or dimension?  Let me just ask

20   you.  What do you think?

21          MR. TROP:  Yeah, the dispute I think mostly is

22   which dimension and does equal really mean equal.  And I

23   think it means equal, not kind of equal.  And dimension

24   means one dimension, not multiple choices.  It's too

25   complicated.  So, like or alike, I assume what they were

1    trying to do is say, well, it doesn't have to be equal,

2    it could be not equal, kind of close to equal.

3              THE COURT:  I don't take it that way.

4              MR. TROP:  Okay.  If like or alike means

5    equal, then I don't have a problem.  I have a problem

6    with the rest of it where it says -- I just think a

7    jury, and your Honor would be a better judge than I

8    would be, measurable extent of some kind, such as

9    length, breadth, depth or height is too much for the

10   jury.  So I just propose a simpler one.  I think my key

11   point is --

12             THE COURT:  Any two dimensions.

13             MR. TROP:  Well, any two dimensions, and I

14   think their's is too complicated.  It doesn't help the

15   jury is my more or less opinion, it's too complicated.

16   And as long as it means equal, it's hard to say that

17   defining equal means they are the same, not alike or

18   like, they've got to be the same, not just kind of the

19   same.  They've got to be the same.  Equal means they're

20   the same.

21             THE COURT:  I get it.  Plaintiff's counsel.

22             MR. LUCIC:  Your Honor, I think the analysis

23   here is going beyond the point.  The term equal in

24   dimension, you know, the defendant's definition again

25   uses the term dimension to define the term dimension

1    which doesn't, you know, the term was, you know, they

2    sought construction of a term and there really isn't, as

3    far as I can see, any discussion over what dimension is.

4    Dimension --

5              THE COURT:  How many dimensions need to be

6    equal?

7              MR. LUCIC:  Well, it's whatever you're talking

8    about.  I mean, if you say, if you say this thing is

9    equal in dimension to that thing, then you're talking

10   about those two things.

11             THE COURT:  They could be equal in length but

12   not in something else, like width, height; right?  Those

13   are the basics.  But I don't know, that's my question.

14   Does equal in dimension mean equal in all dimensions?

15             MR. LUCIC:  It depends on what you're talking

16   about.

17             THE COURT:  You want to say something?

18             MR. NIEVES:  I just want to add that

19   precisely what your Honor said is exactly why we have

20   this definition because what you're alluding to is,

21   well, do you mean equal in length or breadth or depth,

22   which one is it, and that's exactly what's within the

23   definition.  It says like or alike in measurable extent

24   of some kind, either length or breath or dimension.  So,

25   as an example you might have, I mean, we can draw a

1    little --

2              THE COURT:  Well, dimensions mean geometric

3    dimensions.

4              MR. NIEVES:  Correct.

5              THE COURT:  Do you accept that?

6              MR. TROP:  I do, absolutely, your Honor.

7    Measurable extent, we agree with that.

8              THE COURT:  Say that again.

9              MR. TROP:  I'll agree if your Honor believes

10   like or alike means equal, I will take like or alike

11   measurable extent, that will be fine.

12             THE COURT:  Go ahead.

13             MR. NIEVES:  The problem that we had with it

14   is it says any two dimensions, so you can actually have

15   something that's kind of like that, and the other thing

16   is going like this and it's like that, well --

17             THE COURT:  I'm not sure the record can pick

18   that up too well.

19             MR. NIEVES:  But basically my point, your

20   Honor, is you can have something that is kind of like an

21   oval in shape and something else that's like this, you

22   know, and somebody might say, well, those two have this

23   and this are equal or they're not.  Any two doesn't

24   really work.  That's what we're basically saying.  So

25   that's what we thought our definition --

1          MR. TROP:  Doesn't construction cover that?

2    Like or alike of some kind such as, it doesn't say it's

3    got to be length, breadth, that's equal dimension too.

4          THE COURT:  This is a point where neither

5    proposed construction is really a model of clarity.

6          MR. NIEVES:  No, that's it, yeah.

7          THE COURT:  All right.

8          MR. LUCIC:  Okay.  The next term is

9    electrically insulative element.

10          THE COURT:  Yes.

11          MR. LUCIC:  And this one I think is a little

12    bit more complicated in the sense that the argument here

13    really is based on the results of the reexamination and

14    not on the actual language of the term.

15          THE COURT:  You're right.

16          MR. LUCIC:  The definition that we have

17    proposed we think is pretty straightforward.  It's an

18    element that prevents, reduces the transmission of

19    electricity.  All things being equal, I don't believe

20    the defendant really disagrees with that, the general

21    nature of that, of that definition, and of course it's

22    supported as we show by the dictionary definition.

23          What the defendants are saying here is that

24    the, that SignalQuest somehow expressly disclaimed --

25          THE COURT:  Yeah.

1          MR. LUCIC:  -- the exterior shape and

2    therefore this term should be interpreted so as to

3    include a limitation that says that it cannot be -- it

4    cannot have a square exterior shape.

5          Now, I don't want to belabor this, Mr. Nieves

6    has talked about this at some length here, so I want to

7    be very clear.  In terms of the actual, in terms of the

8    actual results of the reexamination, there is the claims

9    of that have come out of the reexamination do not have

10   anything to do with the exterior shape of the

11   electrically insulative element or anything else.  The

12   proposition is on SignalQuest's part that if a party

13   infringes all of the elements of these surviving claims,

14   the claims that have come out of the PTO, irrespective

15   of whatever shape it is on the exterior, then they

16   infringe.  The exterior shape is an element over which

17   there is no, there is no claim for infringement or

18   noninfringement.  The shape of this thing, as you've

19   seen from the way this device works, the shape really

20   doesn't have a whole lot to do with how it actually

21   works, the exterior shape, I mean, there are certainly

22   elements within the body of how this works.  But in

23   order to have a disclaimer there has to be an express

24   disavowal of that limitation of that term, and in this

25   instance there was no such express disavowal.  The

1  nature of what occurred, and unlike the Rheox case which

2  is the case on which the defendant relies most clearly,

3  there was no quid pro quo.  There was not a situation

4  where the Patent and Trademark Office said to

5  SignalQuest, hey, in order to get this patent allowed,

6  you can only get this patent if you give up these

7  claims, if you give up these features of this claim.  In

8  the Rheox case that's exactly what happened.  In our

9  case that is not what happened.  This was a dependent

10  claim that was rejected along with all the other, along

11  with all the other claims in the first instance.  The

12  Patent and Trademark Office said the whole thing was

13  obvious.  Commercial success demonstrated that it was

14  patentable, and therefore when the Patent and Trademark

15  Office came back and said, well, yeah, but the one that

16  you showed us, the device that you showed us to overcome

17  this is round, so we're not going to give you this extra

18  feature, there was no need at that point to give up

19  anything or make any sort of express disclaimer with

20  respect to that feature.  Because we had the broader

21  claims already, there was no need to go through the

22  additional appeal process, and we would have had this

23  claim construction hearing another year from now because

24  we would have gone through another round of examination.

25           So, the language we believe is very clear that

```
 1    in order for a disclaimer to apply, it has to be an
 2    express disclaimer.  We suggested the Genentech case,
 3    which we cited in our brief, is more akin to the
 4    circumstances here, and so therefore we believe that
 5    there is no basis at this point to import the limitation
 6    that they say should be applied to the electrically
 7    insulative element.
 8              THE COURT:  Let me ask Mr. Trop.  I know you
 9    disagree with that legal analysis, but I want to make
10    sure I understand your proposed construction.  When you
11    say it's got to be cylindrical but not square exterior
12    shape, what do you mean by square?
13              MR. TROP:  Square is --
14              THE COURT:  With corners or square as in same
15    length --
16              MR. TROP:  Square-like is the word they
17    disclaimed.
18              THE COURT:  True, yeah.
19              MR. TROP:  And it can have a little bit of
20    curvature in it but it's got to have corners on it, and
21    they gave that up because the patent office said it
22    wasn't patentable, and now they want to get it back
23    here, and so really my preference is you find the patent
24    invalid for that.
25              THE COURT:  I know.
```

1          MR. TROP:  But if you want to save it, this is
2    the way you can try to save it.  The only way I've --
3          THE COURT:  But let me ask again.  What do you
4    mean by not square or square-like, what does that mean?
5    I'm trying to understand, you know, I just saw a diagram
6    a few minutes ago of cylinders with corners, okay.
7          MR. TROP:  Square-like means four
8    substantially equal sides.  They don't have to be
9    perfect, but they could be a little bit curved.  It has
10   to be more of a square and less of a --
11         THE COURT:  But does the length of the
12   insulative piece need to also have the same dimensions
13   as each side of the square, or is the imprecision of my
14   language --
15         MR. TROP:  I take the other view.  I think it
16   can't have any square because that's in the prior art
17   and you didn't show commercial success.
18         THE COURT:  I just mean for the definition.
19         MR. TROP:  I mean, I don't know law to support
20   that off-the-cuff, but what happens in a disclaimer, if
21   you can't get any of it back, so once you disclaim
22   square-like, you can't be equivalent to square-like, you
23   can't be square-like, you didn't go there anymore.
24   You've given it up and everybody in the world can kind
25   of rely on that and you gave up square-like when you

```
1    cancelled the dependent claim, and now you can't get
2    square-like, you can't get equivalent of it, you can't
3    get the defendant's products.  I mean, that's where
4    square-like came from, from the defendant's product.
5              THE COURT:  What was -- I don't know, what was
6    ambiguous about your withdrawal.  I mean, you say it's
7    not clear and ambiguous.  What's unambiguous about it,
8    or what's ambiguous about it is what I mean to say.
9    It's not an argument, it's act, right?
10             MR. NIEVES:  Right.  So, during the
11   prosecution when we went through the prosecution, all
12   the claims were rejected under obviousness.  The
13   independent claims -- actually all claims except one
14   were rejected for having nothing to do with shape, all
15   right.  There was also a dependent claim on argon gas.
16   It had nothing to do with argon gas.  So if there is 30
17   claims, 29 of them never even mention shape, ever.  They
18   were rejected for obviousness.  Commercial success
19   argument was provided.  During the commercial success
20   argument what is required is that each of the
21   limitations of claim that's being considered, so when I
22   look at independent claim number one, I say are you
23   saying limitations of claim number one contained by that
24   product, yes, those limitations are in that product.
25   The requirement is not.  And this does not the law, all
```

1    the limitations of the product belong inside the claim,

2    it doesn't work that way.  So we say okay.  Let's say it

3    was a bicycle to make it very simple.  So, if we're

4    looking at a bicycle in the independent claim, it says

5    at least two wheels, a steering mechanism, a seat and a

6    center mass.  So we look at the product and we say,

7    okay, we've got a green bicycle here.  Does that bicycle

8    there, all limitations in that independent claim, is

9    that contained by the green bicycle?  Yes, it is.  Claim

10   number one is not allowable.  But independent claim

11   number one never mentioned blue, green, doesn't say that

12   the claim has anything to do with color.

13            THE COURT:  Let's talk about shape.  With the

14   prior art combinations that led to the rejection, right,

15   led to the rejection of certain claims, the same prior

16   art combinations that led to that certain evidence be

17   acceptable.

18            MR. NIEVES:  There are different combinations

19   of prior art and different rejections for different

20   claims.  The rejection specific to the dependent claim

21   was not the same as the independent claim or other

22   claims.  There are different rejections --

23            THE COURT:  Were they based on the same prior

24   art combination, that's my question.

25            MR. NIEVES:  I can't tell you off the top of

1    my head right now, but that's not the review in the law.

2          THE COURT:  Mr. Trop says he can tell me, the

3    answer to that question.

4          MR. TROP:  They were rejected over the same

5    combination.  So the patent office said claim 14 to the

6    square is not patentable.  It's prima facie obvious.

7    And they put in their commercial success evidence and

8    they don't show that the square-like shape had

9    commercial success.  And so the patent office says

10   square-like shape is not patentable.  We already told

11   you all of them are obvious.  We already showed you the

12   priority, and you chose not to appeal, and now you want

13   to come back later, after you're out of the patent

14   office, and try to cover exactly the thing we told you

15   was in the prior art.

16         THE COURT:  Can you bring up that slide -- oh,

17   what did you want to say?

18         MR. NIEVES:  I just wanted to say two things.

19   One is we're not claiming to own square shapes.  We're

20   not claiming that the patent covers a specific type of

21   shape.  It's not an element of the claim at all.  The

22   claims do not make a reference to shape at all.  So,

23   there's no reason for us to now add a limitation of

24   shape into a claim that does make no reference to an

25   exterior shape of the electrically insulative element

1    portion.

2              THE COURT:  I get it.

3              MR. NIEVES:  What we'd essentially be doing if

4    we went down this path is a domino reaction.  We'd be

5    taking all the limitations of this product and throwing

6    it into the claims and result in one claim, because why

7    would there be dependent claims.  Apparently we're

8    taking the limitations of the product and putting it

9    into every claim, so there'd only be one claim.

10             THE COURT:  Can you bring up that slide

11   showing the three different examples of cylinders?

12             MR. NIEVES:  Absolutely.

13             THE COURT:  That's the one.  Now, Mr. Trop.

14             MR. TROP:  Yes, your Honor.

15             THE COURT:  Now, this diagram suggests that

16   even the diagram on the left is a cylindrical; right?

17   But you would describe that as a square shape, wouldn't

18   you?

19             MR. TROP:  I would.

20             THE COURT:  All right.  So you don't accept

21   that that's a cylindrical?

22             MR. TROP:  I think I gave that up already,

23   didn't I?  I guess I agreed that cylinders could be --

24             THE COURT:  Well, if you gave that up I don't

25   understand your --

```
1            MR. TROP:  No, because --
2            THE COURT:  Your square-like --
3            MR. TROP:  It can be a cylindrical.  The
4    problem is, you can get all the cylinders in the world,
5    but you disclaimed the claim, you cancelled that claim
6    and said wherein that electrically insulative element is
7    square like, you cancelled that because the patent
8    office said it's not patentable.  You can't come back
9    now and try to cover that.
10           THE COURT:  So you mean, then, just so I'm
11   understanding your argument, you mean a square-like
12   cylindrical like the one on the left?
13           MR. TROP:  Well, I'm using the claim language,
14   and the claim language says a square-like electrically
15   insulative element if I remember correctly.  So you now
16   can't have anything that's square-like and you can't get
17   equivalent because you've disclaimed that.  And if I'm
18   wrong, they've got a bigger problem because they didn't
19   show commercial success for something they say is within
20   the scope of their claims, and under patent law, basic,
21   basic, basic patent law, the priority art is invalid.
22   I'm almost arguing the wrong thing.  I should be arguing
23   their thing and they should be arguing mine.
24           THE COURT:  All right, we are well into this
25   but not through claim construction and the reporter has
```

1    been going for 90 minutes.  That's normally the time we

2    take a break to give the reporter a break, so we'll take

3    a 15-minute break.  We'll come back and continue with

4    claim construction before moving on to summary judgment.

5    We're in recess.

6              (Recess take.)

7              THE COURT:  All right, we just took a little

8    recess.  We're still on claim construction.  I do

9    anticipate taking one short recess before summary

10   judgment.  Mr. Lucic, I'll let you decide where we pick

11   up the trail here.

12             MR. LUCIC:  Okay.  Just to get us up to the,

13   go right to the last page.  Okay.

14             THE COURT:  By the way, I think the confusion

15   we were having before was your proposed construction was

16   if an electrically insulative element, was that if

17   claims are somehow valid, right, cylindrical not square

18   exterior shape, you're really more focused on circular

19   not exterior shape; right?

20             MR. TROP:  No.

21             THE COURT:  No.

22             MR. TROP:  If the patent is valid, I don't

23   want to it cover the square shape.

24             THE COURT:  Got it.  It's not what it covers

25   so much as what it doesn't cover, square.

1          MR. TROP:  That's right, from my point.

2          THE COURT:  Okay, yup.

3          MR. LUCIC:  And just to put the, you know, the

4   end cap on it if you will.  Just to make clear that, you

5   know, our position is not that there was -- there was

6   never any express disclaimer of that term result of the

7   cancellation, cancellation is not an express disclaimer

8   under the case law.

9          THE COURT:  What's the case law?  I don't

10  think that case law is in your papers, is it?

11         MR. LUCIC:  Yes.  We discussed the Rheox and

12  the Genentech case really are the key --

13         THE COURT:  I don't mean cancellation so much,

14  what about withdrawal.  I mean, your point is we didn't

15  disavowal in some explicit unambiguous way.  What about

16  just the act of withdrawing?

17         MR. NIEVES:  During prosecution --

18         THE COURT:  There is case law that says that

19  that's -- well, what's it say?

20         MR. NIEVES:  I can't think of a single case

21  that actually addresses whether or not just not pursuing

22  a claim now means that you can not enforce the patent

23  against anything that has the limitations of other

24  claims.  I mean that's essentially what we're looking at

25  here.  There's a dependent claim that talks about a

1   green bicycle that now, since we decided not to proceed

2   with getting the claim that focuses on a green bicycle,

3   we now can't enforce a claim that just talks about

4   bicycles against a green bicycle.

5          THE COURT:  What's the standard, though, to

6   judge whether withdrawal is some type of disavowal

7   because disavowal is to argument, the argument has to be

8   clear and ambiguous; right?  Does that same clear and

9   ambiguous apply to non-argumentative type --

10          MR. NIEVES:  That's a very good question.  So,

11   I think that the Rheox case and the Genentech case

12   actually speak towards that.  Yes, they have the extra

13   element of the argument which your Honor is referring

14   to.

15          THE COURT:  Those cases with extra clear

16   argument.

17          MR. NIEVES:  Right, but there's actually an

18   extra part in that which we're even further from, which

19   is you notice in each of those cases the independent

20   claim contained language that encompassed what was

21   covered by the dependent claim, okay.  So they

22   specifically, like in the Rheox case, it talks about

23   calcium phosphate, and it says in the dependent claim a

24   specific type of calcium phosphate.  They then get rid

25   of calcium phosphate, and they change it to calcium

1    orthophosphate.  So they specifically modify the

2    independent claim to get over the prior art, because

3    that prior art specific to calcium phosphate did not

4    allow the independent claim to get allowed, so they had

5    to modify the independent claim to get rid of it and

6    then go in for only one derivative of it.  When they got

7    that derivative then the patent office said, oh, and

8    this is separate from the arguments because the

9    arguments, as we mention, make it clear that it's a

10   disclaimer, but the other part is in the present case

11   there was no modification of the claim language of the

12   independent claim ever that had anything to do with

13   exterior shape of the electrically insulative element

14   because it's not even mentioned in the claims.  In fact,

15   it's only mentioned in one dependent claim in the entire

16   patent.

17           So, with the deciding not to proceed with

18   those dependent claims, we've just basically said we

19   don't need them.  That's really it.  We didn't find any

20   reason to continue arguing because those other claims

21   were already allowed having nothing to do with the

22   exterior shape at all.

23           MR. LUCIC:  So just to, the notion here is we

24   are not asserting that the defendants infringe our

25   patents because they have a square-like exterior shape,

1    okay.

2              THE COURT:  I hear you.

3              MR. LUCIC:  That is the result of the

4    cancellation.  If they infringe all the other elements,

5    we will get to that at the appropriate time, if they

6    infringe all the other elements, that's fine, but we are

7    not asserting a claim, we are no longer able to assert a

8    claim that says, oh, and by the way, because you have

9    this square-like exterior shape you also infringe.

10   That's the result.  Not because they now have, because

11   they have a square-like exterior, they don't otherwise

12   infringe any of the other elements of the claims, of the

13   independent claim.  That is the bottom line in all this.

14             THE COURT:  I understand the argument.

15             MR. LUCIC:  Okay.  So let's go to flat end

16   surface, if we may.

17             THE COURT:  Yes.  A boundary surface that is

18   smooth, level or even.

19             MR. LUCIC:  Right, that is our proposed

20   definition.  The defendant's proposed definition is not

21   completely flat, has a flat area.  We believe, again, we

22   think our definition is very straightforward.  Flat is

23   the smooth, even, level, something along those lines.

24   We don't think that anyone would misunderstand what the

25   flat end surface refers to.  Again, the definition

1    proposed by the defendants, again, they use the term

2    flat to define flat.  So they are saying, well, this is

3    the same type of argument that they've used before.

4    Flat doesn't mean necessarily completely flat.  It can

5    be, you know, all these other kinds of things.  That's

6    not how you read, you should read the language.  The

7    language is very straightforward.  The flat end surface

8    refers to something very specific, flat end, and they're

9    saying, well, it could be sort of flat like, flat-ish.

10   That's not the appropriate language.  Our definition is

11   completely supported by the dictionary, and the language

12   is not ambiguous based on the terms of the claims or the

13   specification.

14          THE COURT:  But the dispute here isn't

15   somewhat -- because, and this is true of several of the

16   defendant's proposed instructions, you're not really

17   proposing a definition for flat end surface because your

18   definition doesn't really address surface, it's just the

19   point being it doesn't need to be completely flat.

20   That's your argument; right?

21          MR. TROP:  Correct.

22          THE COURT:  Okay.  Anything you want to add to

23   it in response?

24          MR. TROP:  Yeah.  If you look at one of the

25   embodiments it's got bumps on it.  So if they get their

1    construction, they will lose that embodiment.  I don't

2    know why I'm trying to help them.  It's just confusing

3    to the jury for me to show an embodiment that has bumps

4    on it and then to say the end surface has to be

5    completely flat.  It's not the end of my world from my

6    point of view if they get it, but --

7              THE COURT:  Can't something be flat and have

8    bumps on it?

9              MR. LUCIC:  Yes.

10             MR. TROP:  Their definition is smooth, level

11   and even, and I'm trying to say not completely flat and

12   they're saying I'm wrong.

13             THE COURT:  Bumpy and smooth certainly don't

14   seem to go together.

15             MR. NIEVES:  One thing, if I might add, is

16   just that if you look at the claim it talks about

17   there's a nub on the flat end surface.  So it's not

18   saying the flat end surface, you know --

19             THE COURT:  What about the embodiment point

20   that counsel makes, Mr. Trop makes, that one of the

21   embodiments is bumpy.

22             MR. NIEVES:  That's what I'm referring to, so

23   --

24             THE COURT:  Oh, that's not the nub.

25             MR. NIEVES:  Yeah, there is no embodiment that

1    is bumpy.  I'm not sure what --

2              MR. TROP:  I was referring to what he's

3    talking about.  So, one of their embodiments, the disk

4    on the end has a little bump in the middle of it.  And

5    he's saying it is completely smooth because the nub or

6    bump is on the flat surface, therefore I guess he's

7    trying to argue it's not part of the flat surface.

8              THE COURT:  Well, wait, if it's a nub, it's

9    relative to something.

10             MR. TROP:  It's on a flat surface, but now you

11   have a flat surface that's not flat anymore, I guess, so

12   that doesn't infringe.  Just take the construction

13   without clarification from him.

14             MR. NIEVES:  But just, again, for the claim

15   language --

16             THE COURT:  We have a rare attempt here at

17   concession.

18             MR. NIEVES:  Yes.

19             THE COURT:  Are you worried about that for

20   some reason?

21             MR. NIEVES:  No, not at all, not at all.

22             THE COURT:  Then I guess you don't have to

23   argue about it anymore.

24             MR. NIEVES:  Oh.

25             THE COURT:  So I don't have any difficulty

1    accepting that it can be a flat surface with a nub.

2            MR. LUCIC:  All right, plastic.

3            THE COURT:  Is plastic a description of a

4    feature or is it a description of what its constructed

5    from?  You follow me?

6            MR. LUCIC:  Yeah.

7            THE COURT:  Plastic might mean pliable,

8    moldable, but it might mean constructed of plastic.

9    Which is it?

10           MR. NIEVES:  The term plastic is used with

11   regard to the electrically insulative element, so it's

12   the latter.  It's talking about the composition of

13   something.

14           THE COURT:  Constructed of the substance

15   plastic.

16           MR. NIEVES:  Correct.  So, when it's speaking

17   towards the electrically insulative element, that's when

18   it refers to that, because the plastic is not an

19   electrically conductive element.

20           THE COURT:  So the idea of easily molded,

21   what's that got to do with it?

22           MR. NIEVES:  The reason why, if you look at

23   the claims and you look at the spec and others, the

24   definition of just any moldable material, this is one of

25   the problems that we had way back in college, you never

1    choose the answer that has the word any, because

2    everything falls under that.  If you look at glass,

3    glass can be molded if you have a high enough

4    temperature.  If you look at metal, Metal can be molded

5    if it's a high enough temperature.

6            THE COURT:  Well, glass, like plastic, was

7    once moldable; right?  At some point in its existence it

8    was molded out of a pliable soft substance, so, and

9    that's my question.  This seems to be, this term seems

10   to be describing the substance from which it is

11   constructed, it's made of plastic, made of the substance

12   plastic, not that it's moldable.

13           MR. NIEVES:  Correct, but in the

14   interpretation of the term plastic, the way that the

15   definition is utilized is to talk about that it's easily

16   moldable, because there's a difference between how --

17   how do I put this.  If you say that plastic is any

18   moldable material, then it encompasses metals and others

19   but clearly is not what we're saying.  In fact the claim

20   language specifically says that the electrically

21   conductive element can be selected from the group

22   consisting of plastic and glass.  So, if plastic

23   encompasses glass, then you have glass and glass, which

24   doesn't make sense, the claim wouldn't make sense.  So

25   what we're saying is that it's easily moldable, which is

1     by definition, just the ordinary meaning definition.

2     Does that make sense?

3               THE COURT:  It does.  I think maybe I'm asking

4     a question no one disagrees about.  Plastic is a noun,

5     not an adjective; right?

6               MR. NIEVES:  Correct.

7               THE COURT:  In this claim?

8               MR. NIEVES:  Right.

9               THE COURT:  Okay.  Mr. Trop, do you want to

10    address plastic?

11              MR. TROP:  My big problem here is how is the

12    jury going to find out what easily means.

13              THE COURT:  Okay.  It sounds like what you're

14    telling me, and maybe an expert can tell a jury this, is

15    that you use the word easily, I mean, is it a term of

16    art understood by somebody, you know, understood in the

17    industry or in the field to mean, to distinguish it from

18    glass or other metal when it, easily the buzz words

19    everyone knows it's plastic.

20              MR. NIEVES:  That's precisely what we're

21    referring to, because when someone refers to metal,

22    that's clearly not easily moldable; nor is glass,

23    because it has to be subjected to extremely high

24    temperature.  But that's what we're referring to.

25              THE COURT:  Okay.

1           MR. NIEVES:  And again, that's consistent with

2    the specification in the claims.

3           MR. LUCIC:  Okay.

4           THE COURT:  Next term.

5           MR. LUCIC:  Single internal surface.

6           THE COURT:  Yup.

7           MR. LUCIC:  The definition that we're

8    proposing is one interior surface.  The defendant's

9    definition portions of a conductive element connected

10   only one surface and that surface is covered by

11   insulative element.

12          We think our definition, again, is not that

13   complicated.  It is a very straightforward definition

14   based on consistent with the claims and also supported

15   by the dictionary definition.  If you read the claim in

16   context, if you go to the next slide, the sensor of

17   claim 22, wherein the top surface of the distal portion

18   of the first electrically conductive element and a top

19   surface of the proximate portion of the first

20   electrically conductive element are connected to each

21   other by a single internal surface that is substantially

22   perpendicular to both the top surface of the distal

23   portion of the first electrically conductive element and

24   the top surface of the proximate portion of the first

25   electrically conductive element.

1          So, the claim language makes it very, very

2     clear as to what is being talked about, what is referred

3     to as this internal surface, and again, the

4     specification makes it quite clear.  If you go to the

5     next slide, it's probably a little bit easier to see in

6     the context.  So the single internal surface is number

7     118 on the -- on Figure 2.

8               THE COURT:  Yup.

9               MR. LUCIC:  Specification, again, talks about

10    where the end cap, which is the entire thing is defined

11    by a step where the top portion of the step is defined

12    by a top surface, 116, so that's the exterior of the

13    proximate portion, and middle portion of the step is

14    defined by the internal surface, 118, of the proximate

15    portion 112.  So 118 -- so simply put, the internal

16    surface that is being spoken about here is the surface

17    of the, essentially the step out from the distal portion

18    on the proximate portion.  So, it's essentially the

19    surface around which juts out from the distal portion of

20    the electrically insulative element.

21              THE COURT:  Now wait a minute.  In terms of

22    single internal surface, you propose a construction but

23    you don't really argue it, you don't really brief it.

24    Is that on purpose?  Should I not be concerned about it?

25    You propose portions of the conductive element connected

1  by one -- excuse me, strike that.  Portions of

2  conductive element connected by only one surface and

3  that surface is covered by insulated element.

4      MR. TROP:  Yeah, the reason I put all that in

5  there, if you look at that picture, and I'm just trying

6  to get it clear for the jury, I look at that picture and

7  say I don't understand why 118 is an internal surface,

8  it looks like an exterior surface.  I just want to make

9  it clear how they came up with interior surface.  I

10 thought my construction would be clearer and that they'd

11 like it, and to me their construction is confusing

12 because how do I understand that's an internal surface

13 when it looks like it's on the outside of the element

14 that it's part of.

15     THE COURT:  That's actually a fair question.

16 Now, I don't know if -- you said this a few times and I

17 don't mean to disparage, but a few times you said I

18 don't know how the jury is going to understand this, but

19 as far as I know that's not the standard I'm supposed to

20 apply.  That said, he makes a very good point about it.

21 It would be very difficult for anybody to view 118 on

22 the diagram; right?

23     MR. LUCIC:  Right.

24     THE COURT:  As in some way internal; right?

25 Unless the whole distal portion was somehow adhering to

1   it, which is not the way I think we're to understand

2   this.  So, address that.

3           MR. LUCIC:  Okay.  I mean, I think probably a

4   diagram that shows it in three dimension, we have a

5   slide that shows it in three dimension.

6           THE COURT:  Co-counsel is not so sure about

7   that.

8           MR. NIEVES:  Three-dimensional --

9           MR. LUCIC:  Just, or figure one.

10          MR. NIEVES:  There, you want that one.

11          THE COURT:  There's figure one.

12          MR. LUCIC:  Yeah, okay.  It probably is a

13  little bit easier to see using the second electrically

14  conductive element.

15          THE COURT:  Yeah, is it internal because the

16  electrically insulative element is up against it and --

17  I mean, because I'm looking at that sort of inner lip of

18  160.

19          MR. NIEVES:  Right.

20          MR. LUCIC:  Yeah.

21          THE COURT:  Maybe if you color it in.  I don't

22  know if we're talking about the same thing.

23          MR. LUCIC:  So this is what we're talking

24  about.  So that's the -- defined by the internal surface

25  118 of the proximate portion.

1          THE COURT:  Now, Mr. Trop's point is look,

2    that's the exterior of that electrically conductive

3    element.

4          MR. LUCIC:  Yeah, well --

5          THE COURT:  The proximate portion of it.

6          MR. LUCIC:  See, this is -- that's what I

7    would say is the exterior of the electrically --

8          THE COURT:  Okay, so it's more internal and

9    external of the assembled device, right, of the

10   invention?

11         MR. LUCIC:  Well, it's certainly with respect

12   to the electrically conductive element.  This is the --

13   this is the part that will be the, on the exterior and

14   the part that we've covered in on the other one that

15   would be the internal surface of that.  So, I mean, in

16   the context of the, you know, the language and the

17   description, I don't think anybody would have any

18   difficulty understanding which is which, you know, based

19   on the terms of the specification.

20         MR. NIEVES:  Your Honor, if I might just add.

21   With regard to this, I mean, the portion where this

22   comes up is in describing a step.  So, it's talking

23   about a top portion of the step and then there's a,

24   basically a part that comes down, and then there's

25   another part of it, so it's saying that the internal

1    portion is 118.  Now, the claim language is clear, the

2    spec is clear, the figures are clear, it points it out,

3    I mean, if the jury has any confusion whatsoever, they

4    merely look at an image or they merely read the claim or

5    they merely look at the specification.  Just because we

6    didn't use a specific term that somebody else might have

7    used at that time does not result in that term being

8    indefinite.

9              MR. TROP:  I wasn't trying to argue it was

10   indefinite.  I'm just trying to give the jury a chance

11   to understand it.  It's confusing, you know, and I'm not

12   even arguing it's indefinite here.  I'm just trying to

13   say, you know, I guess we can do this claim construction

14   and throw it to the jury and the jury is not going

15   figure any of that out.  I'd just like them to be able

16   to say, yeah, I understand.  It's a little, the judge

17   explained it to me, it looks like it's on the exterior

18   but it's really the interior because it's got that

19   insulative element.  That's all.  Maybe it's not worth

20   it --

21             THE COURT:  That's what I was trying to say,

22   actually, but apparently I don't understand it.

23             MR. NIEVES:  I think by doing that what we're

24   doing is we're adding extra limitations to a term when

25   that term, if there's confusion as to that term, then

```
 1   you read the claim.  The claim further elaborates upon
 2   that.  So we don't need to seek the language of the
 3   claim and throw it into the term's definition which is
 4   really repetitive in doing claim construction.
 5              THE COURT:  Okay.  Moving on.
 6              MR. LUCIC:  Okay.  Let's go to the top, bottom
 7   and outer surfaces.  We'll take all of these together I
 8   think, your Honor.
 9              THE COURT:  Now, these are probably the
10   surfaces that are going to help me understand lip
11   better.
12              MR. LUCIC:  Right, right.
13              THE COURT:  And I was I think, frankly,
14   confusing myself and you with my questions about lip
15   because these are the surfaces you're talking about.
16              MR. LUCIC:  Right.
17              THE COURT:  But then, let me say this, if we
18   can construe these clearly, eliminate any ambiguity
19   about these surfaces, then lip no longer needs a
20   construction, does it, because it's a lip that protrudes
21   from the surface, and the shape of it is going to be the
22   same as the surface.  Do we agree on that much?  You
23   don't have to.  I'm not trying to get you to be
24   agreeable.  I'm just asking if you agree.
25              MR. TROP:  I think probably you're right.
```

1    Offhand I don't see any reason why you're not right.

2              THE COURT:  All right, go ahead, Mr. Lucic.

3              MR. LUCIC:  All right.  Again, your Honor, the

4    definitions that we have, that we have proffered here we

5    believe are pretty straightforward.  The top surface is

6    the upper surface.  The bottom surface is the surface

7    that's below or under the other parts, and the outer

8    surface is the surface on the, or on the outside.  And

9    the defendants have stated that they're not providing an

10   alternative definition, they simply say that our

11   definition is indefinite and they don't offer

12   construction for it.

13             We don't think this is, again, anything other

14   than something that's completely straightforward.  The

15   language that we are proffering is supported by the

16   dictionary definition.  We're not using it in any way

17   that's contrary to the plain and ordinary meaning of the

18   term.

19             The language itself from the claim, as your

20   Honor has pointed out, you know, refers to this area of

21   the distal portion of the first electrically conductive

22   element which, and this language is used to describe

23   what that, the features of that first electrically

24   conductive element.  It has a top surface, a first outer

25   surface, and a first bottom surface, wherein the first

1   top surface, the first outer surface and the first

2   bottom surface form the first cylindrical lip.  So it's

3   essentially just describing that.  So you understand

4   what the lip is, so you understand what the surfaces

5   are, it's, again, we propose it is very straightforward.

6   They're referring to the surfaces of the distal portion

7   of the first electrically conductive element and the

8   distal portion of the second electrically conductive

9   element are the same.  Again, the language of the

10  specification is quite clear on this and the use of

11  Figure 2 makes it abundantly clear what is being

12  referred to.  So the top surface is 124.  The bottom

13  surface is 126.  And the outer surface is 130.  Those

14  are simply descriptive of those features of the

15  cylindrical lip.  The language here I think is

16  straightforward.  The distal portion, which we're

17  referring to, contains an outer surface 130, that joins

18  the top surface 124 and the bottom surface 126.  It

19  should be noted that while Figure 2 shows the cross

20  section of the outer surface 130 as being squared to the

21  top and the bottom surface 126, the outer surface of 130

22  may instead be rounded or a different shape.  So there's

23  really not any ambiguity to anything that we're

24  proposing here.

25              The confusion, what Mr. Trop addressed, the

1    confusion here again I believe refers to, well, you

2    know, if this is, you know, why is this the outer, why

3    is this the outer surface or the upper surface or the

4    lower surface.  In the context of the claim itself it

5    makes it very, very clear.  We're talking about the

6    element, the distal portion.

7              THE COURT:  Distal portion.  But top, bottom

8    and outer, I don't know, I mean, tell me from a common

9    sense perspective if I'm understanding this correctly.

10   I consider top to be exterior or outer.  Bottom to be

11   interior or inner.  And outer to be insulative element

12   facing.  Does that make sense?  I mean 130 is going to

13   abut, it's going to abut the insulated element; right?

14   Right?  No, it's not, it's going to go inside of it.

15             MR. LUCIC:  Right, the insulative element is

16   going to go over 124.

17             THE COURT:  Yes, yes.

18             MR. NIEVES:  And your Honor --

19             THE COURT:  And the insulative element is

20   going to touch 124, whereas 126 it's not, the balls role

21   in and out of there, right?

22             MR. NIEVES:  Absolutely.

23             THE COURT:  The weights I guess you call them.

24             MR. NIEVES:  And your Honor, you notice

25   that --

1              THE COURT:  So my question before, strike

2    that, it made no sense.  Okay, what did you want to say?

3              MR. NIEVES:  You will notice that 118 and 130

4    have different names.  Again, what we're looking at is

5    the electrically conductive element, all right?  So you

6    asked before, well, why is 118 an interior surface.  You

7    noticed 130 we called an outside portion because you're

8    looking at the electrically conductive element.  So 130

9    is essentially on the outside of it.  118 is not on the

10   outside, it's kind of on the inside, because it's look

11   at a step, it's kind of on the inside of the

12   electrically conductive element.  And if there's

13   confusion, again, somebody looks at the claim, it's very

14   clear, the figure is very clear, the spec is very clear.

15             THE COURT:  Well, when you slide the

16   electrically insulative element on to this element, it's

17   going to bump up against 118.

18             MR. NIEVES:  Absolutely.

19             THE COURT:  Yeah, okay.  Mr. Trop, what do you

20   want to say about these?

21             MR. TROP:  Just two points.  One is remember

22   in the beginning Mr. Nieves showed you how that device

23   --

24             THE COURT:  Can you put the slide back up.

25             MR. TROP:  Appreciate it, thank you.  That's

1    it.  So, remember in the beginning he showed you how

2    this thing would work in any direction.  You can flip it

3    around.  So now what you want to tell somebody is I can

4    flip this around any way you want, now go find the top

5    surface.  No, that's the top surface.  I just flipped it

6    around, now it's the bottom surface.  Now I'll flip it

7    this way, now I'll flip it that way.  There is no top

8    surface.  It doesn't make a bit of sense.  How they can

9    stand here and argue 118 is the interior surface and 130

10   is outside surface, I'm sitting here dumbfounded how one

11   is interior and one is outside.  It makes no sense.

12           THE COURT:  I understand your point.

13           MR. NIEVES:  So just to address that.

14   Everything that you described in the patent you have to

15   describe it at some point, at some point in time.  This

16   element here, we're looking at the electrically

17   conductive element, and so we're looking at it as you're

18   looking at it here, we're describing it as you see it

19   here.  If you take any object that can move at some

20   point, left becomes right, right becomes left, you could

21   never describe anything in the world because everything

22   changes position at some point.  So when you draft a

23   patent you have to draft it with regard to at some point

24   and at some state.  And so if you look at the claim

25   language which specifically says we're describing the

1    first electrically conductive element, and now we're

2    going to describe portions of the first electrically

3    conductive element.  Now, after it's assembled and

4    everything, yeah, you can turn it upside down, that's

5    fine, but the point is you've got to describe it at some

6    point.  So, sure, we're not saying that you can't

7    describe things that just continue to spin.  That's not

8    what we're saying, so.

9          THE COURT:  Why wouldn't it make more sense,

10   though, to describe things in ways that describe, I

11   don't know, what they abut against or adhere to or face

12   toward.  You know what I mean?  Rather than words like

13   top and bottom that have sort of common sense meanings

14   that might not really translate into a multidirectional

15   device like this.

16         MR. NIEVES:  I guess to answer that, you're

17   looking at the device during assembly.  So, I'm looking

18   at this portion and this portion.  Now I describe my

19   hand has a top portion, it has a left portion, a right

20   portion or whatever, I bring everything together.  Now I

21   may walk during the day and my hands may change

22   position, but I don't describe it during the function of

23   it.

24         THE COURT:  So your point is, the terms are

25   meant to describe parts used in an assembly, not

1  function.

2          MR. NIEVES:  Yes.  I mean, granted it's an

3  omnidirectional tilt and vibration sensor which has

4  amazing functionality which we demonstrated in the

5  beginning, which why there's such a high desire for it.

6  But the point is, you've got to describe it at some

7  point, and to come up with terms for every, because this

8  has to be, it's basically an enabling the one of

9  ordinary skill in the art, so now you've got to describe

10  if there's different surfaces.  You can say yes, this is

11  the first surface, second surface, the third surface,

12  but at some point you've got to say the first surface is

13  on top of this or that, to the left of that, you have to

14  do something.  You can't make it so obscure as to try to

15  describe it while it's moving.  You have to describe it

16  as a status, and that's what drafting the patent

17  application is all about.  And I've personally dealt

18  with this myself.  It's pretty tedious dealing with all

19  the surfaces.

20          MR. LUCIC:  Yeah, the purpose of the patent is

21  to enable someone to understand how this thing both

22  works and how it goes together, how you would actually

23  make it.  And we believe that, you know, reading

24  everything in context as a whole, you can understand

25  looking at the claim language, looking at the

1    specification, you can understand how this thing if you

2    follow through the language, which again, is fairly

3    straightforward language in our view, if you read it

4    through altogether in context which the case law tells

5    us we're supposed to do, it allows somebody to actually

6    understand how this thing is put together.  And you can

7    look at it in the context of the specification and

8    figures which demonstrate exactly what you're talking

9    about.  So, are there other ways to describe something?

10   Yes, you could have something that's much more

11   complicated and much more detailed in terms of, you

12   know, all these other things, but you inevitably have to

13   call things something in the context, and we think that

14   based on the way this thing is designed and is put

15   together, the language that is used here will more than

16   sufficiently advise someone who wants to figure out how

17   this works and how it goes together can do that, because

18   as you see, it's not, it's not a, you know, it's a part

19   or a device that has lots and lots and lots of different

20   elements to it, we're only talking about relatively few

21   basic elements.

22           THE COURT:  All right.  Well, that gets us

23   through the terms.

24           Mr. Trop, I let Mr. Lucic sort of go first

25   which sort of had a controlling effect on the narrative.

1    I don't want to deprive you of any opportunity to say

2    anything you want, you know, in a more global way.  Is

3    there anything you want to say about claim construction?

4            MR. TROP:  Your Honor, what I'm going to try

5    to do is cut my presentation down to two points.  One,

6    that the claims are indefinite in the way that they use

7    proximate and distal; and two, that electrically

8    insulative element, if it's valid, can't cover a square

9    shape.  Next slide.  I think I could skip this slide,

10    too, because, you know, plaintiffs have done a good job.

11            Here's the definition of proximate.  It's very

12    near, immediately adjoining, close.  It doesn't make any

13    sense here.  The thing that's called proximate is on the

14    far outside and it's not very near media, close to

15    anything that I know of.  Makes no sense.  Proximate is

16    defined specially.  Distal means situated away from the

17    point of attachment, origin or a central point.  So I

18    kind of marked on their patent a little bit to try to

19    show the central point as one way to try to understand

20    it, and when you look at the central point and the

21    electrically conductive element plugs are on the

22    outside, the piece on the very outside is called

23    proximate when it really should have been distal, and

24    the piece on the inside is called distal when it should

25    have been proximate, I guess, and then there's case law.

1    Next slide.

2           To construe -- so what they want to do is they

3    want to construe distal as proximal, and proximate as

4    distal.  And it's contrary to every definition, we'll go

5    through their cases, it's contrary to all their own

6    cases, and contrary to the definition in the dictionary,

7    contrary to their own dictionary definition.

8           To construe contrary established meaning, the

9    specification must include an explicit definition.

10   There was a recent Federal Circuit case in November of

11   2015.  It says, however, a claim is only given a special

12   definition different from the term's plain and ordinary

13   meaning if the patentee clearly sets forth a definition

14   of the disputed term other than its plain and ordinary

15   meaning.  They have admitted here that they didn't do

16   that.  You just can't use terms contrary to their known

17   meanings and the way they've done it.  Next slide.

18          SignalQuest admits in its brief it did not

19   provide a special definition.  In the brief it says, as

20   such, there is no reason to assign proximate and distal

21   a special meaning.  Therefore the claims are indefinite

22   and they cannot be saved by imparting a special

23   definition.

24          The claims, next -- oh, the claims use the

25   terms proximate/distal portion contrary to established

1  meaning.  The thing they call proximal is on the

2  outside, not the inside closer to the center.  It's the

3  only way I can see it to make any sense of this relative

4  to some frame of reference, it's got to be the center of

5  the device because there's no point of view in this one.

6  There's no, you know, like in a surgical device you've

7  got a point of view of a surgeon pushing a stick like

8  device into a patient.  The point of view would be

9  relative to the surgeon.  We don't have that here.  Next

10  slide.

11          Claims use the terms proximate and distal end

12  and surface contrary to established meanings.  So this

13  is in connection -- they also use proximate and distal

14  with respect to the central member they call it, the

15  electrically insulative element.  So what they do is

16  they say, well, the distal end goes into the -- I

17  probably got it wrong, but they're calling one of those

18  end and one of the surfaces on either end the distal end

19  and one the proximal end, but there's no way to know

20  which one is the distal and which one is the proximal.

21  They're every bit as distal and proximate as each other.

22  So if you look at one end, it's just as far from the

23  center as the other end.  There's no way to assign

24  meaning to distal and proximate as used with respect to

25  the electrically insulative element because it makes no

1    sense.  And even if you were to try to use their saving

2    construction, that distal and proximate are opposite,

3    you still don't know which one here is distal or

4    opposite.

5              Even worse, the specification talks about,

6    they talk about distal end and proximate end, I think --

7    no, it talks about distal surface and proximate surface,

8    144 and 148.  So those are the surfaces but it never

9    tells you what the end is, yet distal end and proximate

10   end is used in the claim.  So, now how do you figure out

11   how end is different from surface?  Well, the plaintiffs

12   say the end is kind of near the surface.

13             These relative terms are not what you're

14   supposed to do in patents.  No one knows what near means

15   or how is anybody supposed to figure that out.  So,

16   you've got kind of a mixing up of distal and proximate

17   with what the real definitions are in the case of the

18   electrically conductive element, and you have kind of an

19   arbitrary assignment with respect to the electrically

20   insulative element which wouldn't enable anybody to

21   figure out which one is the distal end and which one is

22   the proximate end.  Next slide.

23             Even if distal was corrected to proximal and

24   proximate was corrected to distal, one skilled in the

25   art would have no way to determine which end or surface

1   was proximate and which was distal.

2           This is a case they cited.  It says a person

3   of ordinary skill in the art would be able to study an

4   apparatus in light of the '670 patent and determine

5   which end is the distal end.  With this electrically

6   insulative element, either end could be the distal and

7   either could be the proximate.  Nobody skilled in the

8   art can figure out which is which.  Next slide.

9           Construing distal to mean proximal for the

10  distal portion creates an inconsistency for distal

11  surface and distal end.  So you've got multiple

12  confusion.  You use the words wrong and you use them

13  inconsistently.  It's the worst situation.  Next slide.

14          So after, you know, some fair criticism of me

15  for using the terms in the definition, what they want to

16  do here is they want to just say we're never going to

17  tell you what distal is and we're never going to tell

18  you what proximate is.  We're just going to tell you,

19  you want to know what distal is?  It's the opposite of

20  proximate.  You want to know what proximate is?  It's

21  the opposite distal.  It would send one skilled in the

22  art literally in circles.  Next.

23          THE COURT:  Well, so you're saying, your

24  argument is clear, distal and proximate have specific

25  meanings, and these aren't the meanings.

1          MR. TROP:  (No response.)

2          THE COURT:  Is there a term of art that

3   someone of ordinary skill in the art would use to

4   describe opposites, opposite?  I mean, what would he

5   use?

6          MR. TROP:  You could say a first end and a

7   second end opposite the first end.  It would have been

8   easy to do.  You didn't need to use proximate and

9   distal.  You didn't need to misuse proximate and distal

10  with respect to electrically conductive element.  You

11  could have said the end farthest to the outside, you

12  could have defined proximate, you could have used

13  proximate and distal correctly, you could have defined

14  distal to be proximate, you could have defined proximate

15  to be distal.  There's ways you can do it.  They just

16  chose a way that you can't do.  The case law says you

17  can't do this.  You can't use it contrary to your

18  established meaning.  That's enough to hold it

19  indefinite.  You can't use it inconsistently at the same

20  time.  That's enough to hold it indefinite.

21          They cite the Lamoureux case as saying distal

22  is the opposite of proximate.  They did say that, but

23  that's not all they said.  They said distal when used

24  with the term stylet should be given its ordinary

25  meaning, remote from the point of view or the far end,

1    and then this is the part they want, the opposite of

2    proximal.  They didn't just say it was the opposite.

3    They defined it just like I did.  That's the Lamoureux

4    case.  They cite their own Oxford English dictionary.

5    Defined it like I did.  And because they explained the

6    opposite at the end, SignalQuest relies on that and

7    ignores the whole definition that their own dictionary

8    gives.  It's not just the opposite of proximate.  No

9    dictionary defines something being the opposite of

10   something else, neither of which gets defined or

11   construed.  Next slide.

12           So I looked at the question could this be

13   fixed, and I don't think so under the case law.  You can

14   try to construe distal and proximate contrary to their

15   established meanings.  I cite a case in the brief that

16   says you can't.  But you can't because that would make

17   distal and proximate ends and surfaces indefinite.  So

18   if you said distal means proximate and proximate means

19   distal, you still don't know which end of the

20   electrically insulative element is the distal and which

21   is the proximate end.  We know because both of those

22   ends on the ends of that electrically insulative element

23   are every bit as proximal and distal as the other.  So

24   even if you switch them and you say proximate is distal

25   and distal is proximate, the ends aren't anymore distal

1    or proximate than any other, than the other is,

2    therefore it still doesn't make any sense.

3           Their argument that you can just construe it

4    to be opposites is contrary to the case law that they

5    cite; that one skilled in the art still would be unable

6    to determine which end is the distal end and which end

7    is the proximal, neither is more distal or proximate

8    than the other, therefore the terms just really don't

9    apply.  Next slide.

10          I cite some cases, they are in the brief.  I'm

11   not going to bore you with them now.  There's the

12   question could a court fix this erroneous claim

13   language.  It's clear, the case law is clear that courts

14   are not permitted to redraft the erroneous claim.  They

15   cannot interpret claims differently from its plain

16   meaning after specific definition of the specification,

17   and this is the case in which, the cases say even if it

18   turns out the claims don't even read on a preferred

19   embodiment, you can't go back and fix the language.

20          THE COURT:  The reporter is struggling.

21          MR. TROP:  I know, it was getting late, so I

22   was trying to go fast, but I will slow down.  Sorry.

23          THE COURT:  Is anybody catching flights here?

24   Are you catching a flight?

25          MR. TROP:  No, I'm not.

1          THE COURT:  All right, we're in no rush.  I

2     mean, I know this is long, but I'm not in a rush, so

3     take your time.

4          MR. TROP:  Okay, moving to the next slide.

5     This is the electrically insulative element which

6     counsel has addressed to some degree.  And I guess I'm

7     going to go through all the cases and everything else,

8     but basically what they're asking you to do, is asking

9     you to construe the claim to cover something the patent

10    office said was not patentable and still find it valid.

11    And your Honor, I put in all the evidence the patent

12    office relied on and I moved for summary judgment, and

13    they didn't provide anymore evidence of commercial

14    success, so there's still no commercial success for a

15    claim that they say covers an embodiment that the patent

16    office already found was not patentable.  So they want

17    you to construe it to cover unpatentable species.  And

18    that's mind-boggling to me.  But anyway, I'll go through

19    the claim construction.

20          This is the way I guess the Court could save

21    their patent I believe.  You could construe it according

22    to the Rheox case as saying you disclaimed the

23    square-like shape and therefore is not covered.  When

24    they describe what happened to the patent office, claim

25    14 doesn't get a whole lot of play.  Claim 14, this is a

1    claim, it was rejected on the same prior art as all the

2    other ones, it was found to be prima facie obvious.  The

3    only problem was the commercial success evidence didn't

4    go to this claim.  It says wherein the electrically

5    insulative element has a top surface that is square-like

6    in shape.

7                 THE COURT:  Slow down.

8                 MR. TROP:  The reexam chronology which they

9    had gone through pretty thoroughly, but I'm going

10   through it one more time to try to highlight the claim

11   14.

12                THE COURT:  Yup.

13                MR. TROP:  So the claims were rejected as

14   unpatentably obvious.  SignalQuest showed commercial

15   success to what I call the round embodiment.  Claim 14

16   covered a square electrically insulative element.  The

17   PTO withdrew the rejections of some claims based upon

18   the so-called commercial success, that they maintained

19   the rejection of claim 14.  So SignalQuest cancelled

20   claim 14.  Next slide.

21                This is an argument that got addressed a

22   little bit in their briefing and maybe a bit today.

23   Maybe I can explain it.  There's a question I guess that

24   has arisen whether you need both an argument in

25   prosecution and a cancellation or an amendment.  So in

1    other words, I think partly what they're arguing is you
2    have to have argument in order to create a disavowal.
3    You can't just amend or cancel.  And that's not what
4    Rheox says I don't think, and that's not what these
5    cases say.  Basically it's got to be clear, I agree with
6    them on that, but either an argument or a cancellation
7    or slash amendment, is every bit as effective, so it
8    doesn't matter which one you do.  The Rheox case we say
9    we assess whether a patentee relinquished a particular
10   claim construction based on the totality of the
11   prosecution history which includes amendments to the
12   claims and arguments made to overcome or distinguish
13   references.  In the Elkay case it says it is irrelevant
14   whether Elkay relinquished this potential claim
15   construction in an amendment to the claim or in an
16   argument to overcome or distinguish a reference.  It
17   just doesn't matter.  And they're right about Rheox.
18   Rheox does say two things.  It says, hey, you cancelled
19   the dependent claim and you can't now cover it.  And
20   that's what I'm saying.  But I agree that they also said
21   and look at all these arguments you made.  They all
22   further elaborate that you cannot cover it.  But here
23   there's no other conclusion that the patent office found
24   it was unpatentable, the commercial success didn't go to
25   that element, and the patentee cancelled the claim.

1    What else could it mean?  Sure, these examiners that

2    they put a lot of faith in never would have dreamed in a

3    million years they'd be here today trying to cover the

4    very thing that they cancelled out.  I'm sure that they

5    never dreamed this would happen.  Next slide.

6              This is the language out of the Rheox case.

7    It's says as originally filed, claim two of the '600

8    patent was specifically directed to TSP.  After an

9    initial and final rejection and an interview with the

10   examiner, Rheox cancelled claim two, which was

11   explicitly directed in TSP.  So, they were both there, I

12   agree to that much.

13             So now there's the Genentech case which they

14   also rely on, and kind of what happened in Genentech,

15   and I'm sorry it's a little complicated, but Genentech

16   is very different from what we have here.  Genentech is

17   a district court case, and what the court said there was

18   okay, what's the effect when you have an enablement

19   rejection and you change the claim scope.  We don't have

20   an enablement rejection here.  It's a little bit

21   complicated why enablement is different than a prior art

22   rejection.  But the court actually said that pretty

23   good.  The court said look, in an enablement rejection,

24   the problem is is that you don't have the specificity in

25   your specification to support the specificity you have

1    in the claim, so therefore the way you get out of it is

2    if you broaden the claim.  Well, once you broaden the

3    claim, that doesn't have any disavowal effect.  And

4    that's what happened in Genentech.

5              Here the only way once you give up on the

6    prior art rejection is you've got to amend the claim and

7    you've got to effectively narrow it, narrow the claim

8    scope.  So, when you look at enablement rejection, the

9    claim is too specific because they're claiming something

10   they did not disclose.  The only possible amendment to

11   get around it is to broaden the claim.  So generally you

12   don't have a disclaimer by amendment.  Genentech cites a

13   case earlier in the decision that says yeah, there's

14   generally not a disavowal with a broadening amendment

15   like you have in an enablement situation, but then when

16   you get to the discussion of the claim element that the

17   plaintiffs are relying on it didn't repeat that, but it

18   did say one reason this is no good is because it was a

19   broadening claim.  So next slide.

20             So this is a venn diagram.  Hopefully this

21   helps and doesn't hurt.  But the venn diagram is trying

22   to use a circle to show what the claim scope was.  So,

23   if you look on the upper left-hand corner under

24   enablement rejection, let's say you have a rejection

25   that the claim was too specific.  It describes a feature

1    not disclosed.  So just to give you an example.  Suppose

2    in their patent they never disclosed the square

3    embodiment, and then they tried to claim it.  The patent

4    office says no, I'm not saying that there's prior art on

5    this, but you can't have a claim that specifically

6    describes a square embodiment when you didn't even teach

7    that.  So what can you do then?  In that case only, if

8    you could broaden the claim to take out the square

9    embodiment and just say it doesn't matter about shape,

10   that's what you do in response to an enablement

11   rejection, and that would be fine as long as there's not

12   prior art.

13            Well, let's define if you did that.  You

14   broaden it from limiting it to square shape to cover any

15   shape in an enablement amendment.  If you move down, now

16   what happens when suppose the examiner now finds the

17   square shape.  So, I'm trying to show there the dark

18   green circle is the square shape encompassed by the

19   claim scope and on your amended claim as far as

20   enablement rejection, you can't get that now.  So now

21   you have to, if you move to the next picture, you have

22   to describe a claim or write a claim that excludes that

23   prior art embodiment.  You have to narrow it.  And the

24   effect of that narrowing is to limit the claim scope.

25   And that's what happened here.  They couldn't get the

1    dependent claim to the square shape allowed.  So they

2    cancelled the dependent claim and there is now two

3    options.  One is you could find that their original

4    claim covers the square shape, which I don't know how

5    they get around it, judge, we submitted all the evidence

6    to the patent office.  We said here's the evidence.  The

7    square shape is not patentable.  It was found obvious

8    for all these reasons.  They didn't show commercial

9    success for it.  Not patentable.  So you can say, well,

10   they admit their claims cover the square shape.

11   Invalid.  Or you could say, no, I'm going to say you

12   disavowed the square shape when you cancelled that

13   dependent claim.  Now your claims don't cover it.  Now

14   your claims don't cover the prior art.  I say to you,

15   you know, I think what should be done, it should be held

16   invalid, your Honor.  But this is another option.  It's

17   not my preferred option, but it's an option the Court

18   could take, I believe, although if you look at the case

19   that we discussed, they never said, oh, wait, we'll just

20   go construe the claim to save it.  They said, no, you

21   argued it covers this and you're stuck with it, and so

22   we're going to invalidate your patent.

23           I throw that option out.  Next slide.

24           So, I believe that cancelling the claim of the

25   square shape in response to prior art rejection is a

 1    disavowal as was argued in Rheox.  Genentech doesn't

 2    really say anything different.  I call it flawed, but

 3    you could really argue it's entirely consistent with

 4    what I'm saying, because in that case they basically

 5    said there's no disavowal because you broadened the

 6    claim.  And of course there can't be a disavowal by

 7    broadening, you can only disavowal by cancelling or

 8    narrowing.  So I think I explained that.  Next slide.

 9            I'll just show this quickly.  I told you about

10    this.  This is my point about the diameter can be any

11    diameter.  I guess there's a fault that there's only one

12    length for diameter.  One is circular embodiment, the

13    other is only one length, but once you start saying

14    you've got square embodiments too, you've got more than

15    one diameter.  You've got different lengths in diameter.

16    So it's not just, there's no reason there shouldn't be

17    any diameter.

18            This is that, we discussed this too, your

19    Honor, this gives us the cites out of your prior

20    decision that you can't read entirely into the claim,

21    and so electrically conductive element we don't think

22    should be entirely electrically conductive.  It can be

23    electrically conductive, but it doesn't need to be made

24    of entirely electrically conductive material for the

25    same reason in the prior claim construction.  Next

1    slide.

2         So, I think proximal and distal are insolubly

3    inconsistent and used contrary to their established

4    meaning without a specification, special definition, and

5    therefore the claims are indefinite.  There was a lot of

6    argument saying, oh, someone skilled in the art can

7    figure out what distal means and proximate means, and I

8    don't see that in the cases.  The cases say if you use

9    it contrary to the ordinary meaning, you have to put a

10   special definition in the specification.  They say they

11   it.  They agree they didn't do that.  They didn't do it.

12   Doesn't matter if somebody could go by inverse logic to

13   try to figure it all out --

14        THE COURT:  But the patentee can use the same

15   word in two different ways to mean two different things

16   if it makes that clear in the patent, right?  You know,

17   when applied to, just to use the language in this case,

18   when applied to an electrically conductive element it

19   means this, but when applied to the elements of a

20   electrically conductive element mean something else;

21   right?

22        MR. TROP:  It could, but you see at least one

23   to two cases were using it contrary to its established

24   meaning.  So the only way you can do that is you have to

25   say in the specification.  When you're using contrary,

1    you've got to give a special definition.  You have to

2    say distal means proximal, proximal means distal.  You

3    have to say a special explicit definition in the

4    specification or you're not allowed to do that.  They

5    give you the privilege to use the terms contrary to

6    their ordinary meaning, but to do so the quid pro quo is

7    you have to have the special definition in the

8    specification to do it, otherwise you're doomed.  So, if

9    you used it in two different ways, one of which is

10   contrary to its established definition --

11            THE COURT:  What about both of them being

12   contrary to the established --

13            MR. TROP:  You're done for unless you have two

14   special definitions.  You could say -- you could do it

15   like this.  You could say in connection with

16   electrically insulative element, when I use distal I

17   mean this.  In connection with electrically conductive

18   element, when I use distal I mean this.  You could have

19   done that.  The cases give you the power to do this.  In

20   patent lingo it's called the patentee has the right

21   to --

22            THE COURT:  Right, but you don't even accept

23   the proposition that you've ever used these terms in

24   contradiction to your accepted definitions; right?

25            MR. LUCIC:  Exactly, your Honor, that's

1    correct.

2            MR. NIEVES:  That's actually it.

3            THE COURT:  I understand.  Okay, you want a

4    couple minutes to respond?  Okay.  Sure.

5            MR. NIEVES:  Well, I guess just quickly in

6    summary, I don't want to go over the same thing too many

7    times for your Honor, but there were two main issues.

8    One of them was with regard to the broadening of a claim

9    which had to do with the Genentech case specifically.

10           Again, in our prosecution history we didn't

11   broaden the claim.  We didn't amend the claim to have

12   anything to do with regard to external shape of the

13   electrically insulative element.  Again, the exterior

14   shape was never an issue with regard to any of the

15   claims except one, and what we're not hearing the

16   defendants argue is that, well, if you ever cancel a

17   claim, that now means you can never go after a product

18   containing that element.  That's not the law.  That's

19   simply not the case.  If I have 15 claims and I decide

20   to cancel one claim without prejudice, I decide to

21   cancel it.  That's it.  If a product has that element, I

22   don't claim that I own that element, but if it has the

23   other five elements that are in the claim that are

24   allowed, then it infringes, not because of the one

25   element that was in the dependent claim, but because of

1    the five elements that are in the independent claim.

2    That's the point.  And in the prosecution history here,

3    and again, I'm sorry if I'm saying the whole thing all

4    over again.

5             THE COURT:  That's okay.

6             MR. NIEVES:  But in the whole prosecution

7    history, all the claims are rejected for obviousness.

8    We provided the commercial success argument with regard

9    to some of the claims, and for some of the dependent

10   claims, including argon gas and the exterior shape of

11   the electrically insulative element, we decided not to

12   provide argument with regards to that at all except to

13   say it's dependent on an independent claim, that's it,

14   because we knew that the independent claims were going

15   to be allowed, and they were.  And after they were

16   allowed we said, well, look, we can continue to argue

17   the case law with regard to dependent claims, or we

18   could just be done, and we didn't want to go through,

19   again, another year of prosecution, another hundred

20   thousand dollars which is not good for our client, so we

21   just let it go because we already have what we want.

22            THE COURT:  But you understand I can't rely on

23   any of that.  I can't rely on motives for your

24   decisions.  I have to rely on the import of the

25   decisions you make, the ramifications, not why you made

1   them.

2           MR. NIEVES:  Absolutely.

3           THE COURT:  And I don't mean to be dismissive.

4   I just don't understand why you're telling me that.

5           MR. NIEVES:  I guess what I'm saying is for

6   the basis of the legal analysis, what actually happened

7   procedurally was there was obvious rejection, and then

8   commercial success was provided for some of them.  No

9   legal arguments were provided for the dependent claims

10   that were not falling on the commercial success.  Those

11   were let go.  That's it.  That's all that happened.

12   That's not an express disavowal.  That's not coming out

13   and saying that our independent claim that has nothing

14   to do with those limitations now somehow did have

15   something to do with those limitations, and now since

16   the commercial success argument was only provided for

17   the independent claim, then --

18           THE COURT:  I guess my question, a disavowal

19   by argument has got to be clear and unambiguous, that's

20   the standard.  My question before was, a disavowal by,

21   you know, you call it cancellation or, you know, what

22   was the word I was using.

23           MR. NIEVES:  Amendment.

24           MR. ROUVALIS:  Withdrawal.

25           THE COURT:  Withdrawal.  Thank you.  Is there

1   authority on what the standard is for, what the standard

2   is for how clear and unambiguous that must be, or is

3   there law on this, because I don't think you've given me

4   that.  You tried to in those slides, I see that, but

5   what's the standard by which that's judged?  You know,

6   an argument can be evaluated for how clear and

7   unambiguous it is in terms of whether it's disavowing,

8   right, something, some aspect?

9             MR. NIEVES:  I think there's two parts to

10   that.  One is with regard to the cases that are in this

11   prosecution history, the Rheox case, the Genentech case,

12   it wasn't just a legal argument.  It was an amendment of

13   the independent claim.  There was no amendment of a

14   claim in our case at all.  That independent claim had

15   nothing to do with exterior shape of the electrically

16   insulative element at all.  There was no amendment to

17   change the scope of that.  There was no amendment to add

18   an element to that.  Nothing.  It never was a topic of

19   the independent claim at all.  So that's one way to

20   differentiate.

21             The other part is I'm sure there is case law

22   that we could present to your Honor that speaks towards

23   canceling of the claim in and of itself without

24   prejudice, with nothing else, is not an affirmative

25   disavowment.

1            THE COURT:  Well --

2            MR. NIEVES:  But --

3            THE COURT:  You did that already?

4            MR. NIEVES:  We did.  That's the Rheox case,

5    Genentech case and the other cases that speak towards

6    it.

7            THE COURT:  Okay, all right.  We will, thank

8    you, we will take one more recess and then hear argument

9    on summary judgment.

10           (Recess taken.)

11           THE COURT:  All right, we're still here on

12   SignalQuest v. Chou.  We've had the hearing on claim

13   construction, the Markman hearing, and now we proceeding

14   to the defendant's motion for summary judgment on

15   several issues.  Who's arguing.  Mr. Trop?

16           MR. TROP:  Yes, your Honor.

17           THE COURT:  Your motion.  Is Mr. Chou still

18   CEO of these entities today?

19           MR. TROP:  He's CEO of Oncque.  I think they

20   actually have a footnote, and I forgot what it said.  I

21   don't think he's CEO of Bravotronics.

22           We have two arguments with respect to summary

23   judgment.  One is invalidity, and we've already touched

24   on it quite a bit, because the obviousness is overcome

25   with respect to only one of two embodiments,

1    SignalQuest's claims is covered by -- the claims cover

2    the prior art and therefore the claims are invalid.

3              THE COURT:  I do have your paper.

4              MR. TROP:  With respect to infringement, the

5    only active infringement that I understand is being

6    alleged is that there was an offer for sale within the

7    United States, and that's based on quotations, and we do

8    not believe that if those were offered, any of them were

9    within the United States as contemplated by the case

10   law.  And this is a different question than the

11   jurisdiction question that's been looked at and the

12   Federal Circuit cases make that clear.  So now I'm on to

13   slide three.

14             This is just a general thing, that you can

15   have a patent that is obvious over the prior art, and

16   that's not what you call prima facie obvious, but

17   obvious over the prior art but in relatively limited

18   circumstances.  Even though it's obvious over the prior

19   art, you can get around that obviousness by showing

20   evidence of secondary consideration.  One of them is

21   commercial success, and that's the one we're talking

22   about here.  But there's other ones as well.  Put

23   another way, commercial success or other secondary

24   considerations may presumptively be attributed to the

25   patented invention only when the marketed product

1   embodies the claimed features, and is coextensive with

2   them.  So this is how they were able to get some claims

3   allowed that even though the patent office said

4   everything in your -- everything you claim is in the

5   prior art, somehow in view of the commercial success

6   evidence it must not be obvious, so we will allow it.

7   In the briefing, you know, we cite some articles that

8   say Federal Circuit's been very hard on commercial

9   success and relatively limited in application.

10          So the first point here is -- I'm on slide

11   four.  This is a showing that they made to the patent

12   office in which we submitted here of the embodiment that

13   SignalQuest sells, and I think it's pretty evident that

14   it's round.  That everything about it is round.  The

15   central member is round.  The end plugs are round.

16   Clearly a round embodiment.  And that's the only

17   evidence, they only showed evidence of commercial

18   success for that embodiment.  Next slide.

19          They did tell the patent office about a

20   square-shaped embodiment, and they used the defendant's

21   products to illustrate what the IQ is making, and you

22   can see it's definitely square and not round, although

23   it does have a little curvature.  Next slide.

24          So, claim 14 is an example of a claim that was

25   cancelled.  And claim 14 definitely calls out the square

1   being square-like in shape.  But then even though they

2   showed their commercial success evidence, the patent

3   office said you haven't overcome the rejection of claim

4   14, and as Mr. Nieves points out, some other claims too.

5   And underlying part is the most important.  Since the

6   patent owner has not addressed or provided any evidence

7   of commercial success of claims 3, 14 and 21 in the

8   manner as for the other claims discussed above,

9   rejections of these claims are not overcome and are

10   maintained.

11          And the same can be said with respect to the

12   record on summary judgment here.  No further commercial

13   success evidence was offered in response to all the

14   patent office materials that we submitted.  Next slide.

15          So as you well know, SignalQuest cancelled

16   that claim 14 and therefore I believe it's clear that

17   SignalQuest has conceded by its evidence the commercial

18   success was not commensurate with the scope that it is

19   arguing here today of independent claims.  So they are

20   claiming that their independent claims cover both square

21   and round and any shape, I believe, but their evidence

22   of commercial success only was addressed to round shape.

23   Next slide.

24          And this kind of points out that SignalQuest

25   asserts that square shape infringes, just to quote out

1    of a heading out of their brief that defendant's product

2    which we saw earlier, they've asserted it infringed, so

3    therefore it's clear there's a judicial admission at

4    least against SignalQuest that their claims as they got

5    them allowed covered embodiment that was in the prior

6    art.  Next slide.

7              This is that same Akamai case that the Federal

8    Circuit decided in November 2015 after the briefing.  It

9    basically says admissions about claim scope are binding,

10   and I would think that would apply to summary judgment

11   as well.  The record on summary judgment is they're not

12   backing off of their broad claim scope, and therefore

13   they can be held to that claim scope for purposes of

14   summary judgment.  Next slide.

15             I think they pointed out that their

16   specification does disclose both round and square-shaped

17   central members, and as you will see, that's critical in

18   distinguishing the cases that they rely on.  They say it

19   should be noted that the central member, that's the same

20   as the electrically insulative element 140, need not be

21   tube-like in shape.  Alternatively, the central member

22   140 may have a different shape such as but not limited

23   to that of a square.  Next slide.

24             So the bold heading says a prima facie obvious

25   patent is invalid when its claims cover two embodiments

1  but commercial success evidence for only one embodiment

2  is offered.  And this is the Muniauction case that's

3  discussed in the briefs and cited here.  And I've

4  underlined the first part of it, it's important,

5  unfortunately I didn't make this as clear as I should

6  have in the brief.  It says although both auction types

7  were disclosed in the written description of the '099

8  patent, and they cite a whole punch of parts, and they

9  include conventional all-or-none bidding, as well as

10  maturity-by-maturity bidding.  Thus, the 1999 award

11  lacks the required nexus with the scope of the claim.

12  So the 1999 award was asserted as secondary

13  consideration.  It was basically recognition I think by

14  the industry.  So they were arguing that, oh, we have

15  secondary consideration just like SignalQuest is arguing

16  we have secondary consideration only in the case of

17  SignalQuest's commercial success here, which I think can

18  just be recognition.

19          And the court notes that our conclusion as to

20  the nexus between this award and the claims is

21  consistent with the long-established rule that claims

22  which are broad enough to read on obvious subject matter

23  are unpatentable even though they also read on

24  nonobvious subject matter.  So, here we have the

25  situation where two embodiments are described in the

1   patent specification, commercial success for one, patent

2   held invalid.  Next slide.

3          This is trying to show the parallels between

4   present case and the Muniauction.  So on the left

5   Muniauction shows response to prime facie showing of

6   obviousness, and on the right the response to prima

7   facie showing of obviousness, that prima facie showing

8   was made in the patent office, it was resubmitted here.

9          Next element number two is evidence of

10  secondary considerations were submitted.  Same thing

11  with SignalQuest, just different types of secondary

12  consideration.

13         Next item three, there were two embodiments

14  disclosed in the written description.  Same thing in

15  SignalQuest.  With respect to that central member they

16  disclosed tube-like one and a square-shaped one.

17         Moving on to number four, Muniauction, they

18  only show secondary consideration for one of the two

19  embodiments, maturity-by-maturity bidding, and not the

20  second embodiment, all-or-none bidding.  And likewise in

21  the SignalQuest case there are two embodiments

22  disclosed.  They only show the secondary consideration

23  for one of the two embodiments, the round one, not the

24  second embodiment, the square one. In Muniauction the

25  patent was held invalid, and that's the question we have

1   here today.  I don't think there's any way to
2   distinguish this case, and we will see.  Next slide.
3           So one way SignalQuest has tried to
4   distinguish Muniauction is they cite the cases that say
5   you don't need to show every possible embodiment or
6   every conceivable embodiment to make out a showing of
7   secondary consideration.  And that's true.  But that's
8   not what Muniauction says here.  I think you'll notice
9   Muniauction is inconsistent with that.  They don't say
10  that you have to show secondary consideration for
11  everything that somebody can think of as being covered
12  in the claim.  They say you have to, but you do have to
13  show secondary consideration for the embodiment that you
14  specifically described in the specification.  So if you
15  put two embodiments in the specification, you have to
16  show a secondary consideration for both of them, not
17  just one.  That doesn't mean that the defendant like me
18  can come in and come up and concoct some crazy
19  embodiment and say you've got it covered, you've got to
20  show secondary consideration for that.  Now, Mr. Nieves
21  likes to give the example suppose, suppose I have a
22  patent that covers a red deal and a blue deal.  I
23  probably got the colors wrong, but do you have to show
24  secondary considerations for that?  Generally no.  But
25  if you put it in your patent, one embodiment is blue and

1    one embodiment is red, if you do that you've now

2    highlighted those two embodiments and under the

3    Muniauction case you've got to show a secondary

4    consideration.  Next slide.

5             That's basically -- let me just stop there.

6    That's basically the argument on summary judgment.  That

7    we have an unrebutted prima facie case of obviousness,

8    an admission of no showing of commercial success with

9    respect to one and two embodiments, and a Federal

10   Circuit case that says when you describe and enumerate

11   two embodiments, you have to show commercial success for

12   both.  Therefore we believe the Court should find the

13   patent invalid.

14             THE COURT:  Yup.

15             MR. TROP:  Next slide.  So now moving on to

16   the summary judgment of infringement with respect to

17   offer for sale in the U.S.  The fundamental issue here

18   is I'm not disputing or arguing anything about these

19   quotations today.  I'm only arguing one thing.  And I

20   think it's the thing we all agree about.  I don't think

21   there's any fact issue.

22             The title transfer, the title was the transfer

23   in Taiwan, not the United States.  And therefore you go

24   through the cases, there was no offer for sale within

25   the United States, and I know there's some case law and

1    personal jurisdiction that's not on all fours with that,

2    but the Federal Circuit has said that's personal

3    jurisdiction, that's a whole different standard.  Here

4    the question is liability, and there is, we will get to

5    this, but there's a presumption against extraterritorial

6    application of patent law.  So basically you've got to

7    have something more than negotiation and quotations

8    coming in in order to get an offer for sale.  And there

9    was lots of cases, but that's becoming very clear.  Halo

10   is clear and the Cybiotronics case is clear.  You've got

11   to have something in the United States, and just sending

12   a quotation isn't enough, negotiating isn't enough.

13   It's not enough to go, come to the United States and

14   talk to the people and try to get them to buy it.

15          THE COURT:  And you're saying it's undisputed

16   title would transfer in Taiwan?

17          MR. TROP:  So --

18          THE COURT:  By title would transfer, you mean

19   what exactly?

20          MR. TROP:  Title transfer, so title -- if the

21   goods had ever been made, if there had ever been a

22   transaction, nobody is contending a sale ever occurred,

23   but let's suppose the sale had occurred, because they

24   were all exports or FOB Taiwan, title transferred in

25   Taiwan.  Now I agree when I read the cases, even with

1    that, if my client had sent those products to the United

2    States, that would have been a sale, but they never went

3    that far.  They never got a chance because they got

4    rejected, therefore the necessary acts in the United

5    States never happened, and it's not good enough to

6    almost infringe.  You've got to do it -- and we don't

7    know whether they would have done it if they had the

8    chance, we don't know what would have happened, but they

9    didn't get that far.

10            So, I've got to go through the cases now and

11   try to go slow, but also be as quick as I can.

12            So you must have activity in the United States

13   to establish infringement.  This is the Halo Electronics

14   case which I believe is the most recent Federal Circuit

15   case.  It says when substantial activities of a sales

16   transaction, including the final formation of a contract

17   for sale encompassing all essential terms as well as the

18   delivery and performance under the sales contract occur

19   entirely outside the United States.  So that would be

20   the situation where everything happened outside the

21   United States.  You delivered outside the United States

22   and the performance is outside the United States.  And

23   then it goes on and says, pricing and contracting

24   negotiations in the United States alone do not

25   constitute or transform those extraterritorial

 1  activities into a sale within the United States.

 2          So, what I read them to say is pricing,

 3  sending quotes --

 4          THE COURT:  Right.

 5          MR. TROP:  -- contracting, negotiation, aren't

 6  enough.  Now, there is a case if you contract and you

 7  specifically commit and agree to deliver to the United

 8  States, then you've got a problem.  But we don't have

 9  that.  All we have is --

10          THE COURT:  You don't have anything definite.

11          MR. TROP:  Pardon me?

12          THE COURT:  You don't have anything definite.

13          MR. TROP:  That's right.

14          THE COURT:  So then we don't have summary

15  judgment.

16          MR. TROP:  We do have summary judgment.

17  Nothing ever happened.  So there's no -- summary

18  judgment, their burden of proof, they have no proof of

19  any act that the case is recognized in the United

20  States.  So, they didn't --

21          THE COURT:  But they contemplated delivery

22  within the United States.

23          MR. TROP:  It doesn't matter.  It doesn't

24  matter.  So in other words, you have to do an act in the

25  United States.  You can't just think about it.  Thinking

1    isn't enough to do it.  The case law is clear, you have

2    to have activity, not just thinking about it.  And we

3    don't even know where these products would have been

4    delivered.

5              THE COURT:  Well, that's the point, we don't

6    know where.  You're trying to say if there had been -- I

7    know your argument is contracted and negotiation in the

8    United States is not enough.

9              MR. TROP:  That's right.

10             THE COURT:  But if the terms were delivery to

11   the United States, it's not enough just because they

12   were never delivered?

13             MR. TROP:  There was no term delivered.

14             THE COURT:  Well, it's not clear.

15             MR. TROP:  Well, but you have to have

16   something.  You can't just say, well, maybe you would

17   have delivered to the United States --

18             THE COURT:  But you would have to have

19   something.  You're moving for summary judgment.

20             MR. TROP:  I do not, it's their burden of

21   proof, your Honor.

22             THE COURT:  It's your burden on summary

23   judgment.

24             MR. TROP:  It's my burden to establish a prima

25   facie case.  I've asked them to show me their prima

1   facie case, and they said it's on sale, and I say it's

2   got to be within the United States and there's no

3   evidence within the United States.  There's no fact

4   issue.  They've got nothing in the United States.  I

5   can't prove a negative.  There's no evidence of a sale

6   of an activity in the United States that's cognizable

7   under the case law.  Isn't that right?  It's their

8   burden of proof to show something, that something

9   happened in the United States that's cognitive.  Nothing

10   happened in the United States that's cognitive under the

11   case law.

12          THE COURT:  But that would mean that offers

13   don't constitute infringement.

14          MR. TROP:  They do.  An example, the case law

15   I told you about, that's the Transocean case, they

16   offered to sell, okay, and they specifically contracted

17   that they would deliver the product to the United

18   States.  It's not the vague situation here, we don't

19   know where it was going to go.  They specifically

20   contracted the United States.  Federal Circuit says

21   you're done for.  That's an offer for sale within the

22   United States because you've done that one more act.

23   You haven't just undergone contracting negotiations,

24   you've done an affirmative act.  You've contracted to

25   deliver to the United States.  We don't have that here.

1  We have title, intended title transfer with no receipt.

2  No evidence of where the products would have or could

3  have gone.  We have some evidence that even though the

4  address of the person who set the quotation --

5          THE COURT:  Look, what we do know is that we

6  don't have -- is that contracting negotiation in the

7  United States is not enough.  We don't know if delivery

8  would have been made to the United States.

9          MR. TROP:  Right.

10          THE COURT:  So, isn't that a genuine issue of

11  material fact, and if it turns out that the evidence is

12  that it would have been the United States, there's a

13  sufficient offer for infringement.  No?

14          MR. TROP:  No.  Because you have to do

15  something.  You can't just say maybe, maybe if this

16  happened, that happened, this happened I would have

17  brought them into the United States.  It never happened.

18  They never even got to the point where they decided to

19  deliver to.  The person never came back in response to

20  the quote and said, hey, would you mind delivering it to

21  my plant in so and so.  We have one case where the

22  actual, one of the documents they were relying on --

23          THE COURT:  But the purchaser was located in

24  the United States.

25          MR. TROP:  Well, let me explain --

1          THE COURT:  You're the one who is really

2    saying it may have been delivered to, but we don't know

3    that any more than we know anything else.

4          MR. TROP:  That's right, but there's no way to

5    know because it's the unknowable because it never went

6    far enough to ever decide where it was going to go.  And

7    one case --

8          THE COURT:  We might know after we have a

9    trial.  We might know.

10          MR. TROP:  Might know what, your Honor, there

11    never was an agreement.  There never was an accepted

12    thing, so therefore you have to bring all the

13    purchasers -- let's suppose that happened.  Suppose we

14    go to trial and I bring the purchaser and he said, yeah,

15    I was go ask them to bring it to the United States.

16    What's my cross?  Do you know if they would have or not?

17    No, I don't know.  Okay, what have we got?  We have a

18    trial, we wasted a bunch of time.  What more could we

19    have accomplished?  What more can they do?  They can't

20    read their mind.  And even if the purchaser said, oh, I

21    really wanted to deliver it to the United States, and if

22    he refused to deliver it to the United States, I

23    wouldn't have done it.  Well, we don't know what would

24    have happened in that case.  We don't even know where

25    these people might have asked for.  We don't know what

1    would happen because the thing never went far enough.

2    It's a big difference between an offer for sale.  Yeah,

3    you're right, an offer for sale is tough.  In a sale

4    situation it's easy.  If you delivered to the United

5    States, you're dead.  That's why it's tough, because of

6    this presumption that where did the transaction take

7    place, and you can't cover, you can't -- the United

8    States is not the be-all and the end-all of patent law.

9    In this case, if it was a legitimate offer and if it was

10   infringing, the FOB Taiwan would infringe, and if there

11   was a Taiwan patent, it would infringe Taiwan law, and

12   Taiwan law would decide that.  Here nothing went far

13   enough so.  So the court can't -- I can't see what the

14   evidence would be.  So let's suppose the person says,

15   oh, I was going to ask them to deliver to the United

16   States, but I never got that far.  Would that make any

17   difference?  You still don't know would they have

18   delivered.  Suppose even my clients said, well, if they

19   asked me to deliver I probably would have under the

20   right terms.  Would that do it?  They never did an act,

21   they never did anything.

22           THE COURT:  What if the quotation only

23   contemplated delivery to the United States.  That's the

24   offer.

25           MR. TROP:  But if it did, if it said -- that's

1    <u>Transocean</u>.   In <u>Transocean</u> the person contracted, in the

2    contract he said I offer to sell you this and I will

3    deliver it to the Gulf of Mexico and perform the acts

4    there.

5            THE COURT:  But the buyer was here in the

6    United States.

7            MR. TROP:  I give you an example --

8            THE COURT:  You draw inferences in favor of

9    the non-moving party in summary judgment, and you're the

10   one kind of injecting the fantasy fact that it might be

11   delivered somewhere else.  Why would anybody --

12           MR. TROP:  It's not a fantasy fact, it's got

13   to be a potential fact.  It doesn't matter.  It never

14   got that far.

15           THE COURT:  Not only is it a potential fact,

16   it's the most likely fact, based on the evidence we

17   have.

18           MR. TROP:  But --

19           THE COURT:  I don't get to make up, I have to

20   draw inferences in favor of the non-moving party.

21           MR. TROP:  Let's suppose the inference is that

22   it would have happened.  The problem is, what act did my

23   client do that was an actionable act within the United

24   States.  Sending a quote, they say, is not good enough.

25   If you can tell me what that act is, I'll withdraw the

1    motion.  There was no act, your Honor.  There's nothing

2    they did.

3              THE COURT:  You said -- look, have you put on

4    evidence that said this offer did not contemplate

5    delivery to the United States?  You're totally within

6    your power to do so.  Now, they might have had to try to

7    find a way to dismantle that --

8              MR. TROP:  Nobody knows.  We don't know

9    because we don't know what the customer asked.  It's all

10   hypothetical.  They give just one example.  They give an

11   example, I'll tell you, so, and we can show you that in

12   one case there was a quotation to a U.S. company, and

13   the U.S. company came back and said, oh, yeah, yeah, you

14   know, we'd be interested in maybe a hundred of these

15   things, but you'll have to deliver it to our contract

16   manufacturer in India.  So there was an example in their

17   evidence --

18             THE COURT:  Sure.

19             MR. TROP:  That's why, and if you think I have

20   to rebut it, there's my rebuttal.  My rebuttal is

21   there's no reason to presume an act in the United

22   States.  And in my opinion, I don't even need that,

23   because there's got to be a potential act, but that

24   didn't go far enough.

25             THE COURT:  Even if your client had been

1    willing to deliver to the U.S. or even contemplated

2    delivering to the U.S., if we don't know if they would

3    have accepted it in the U.S., we don't have

4    infringement.

5              MR. TROP:  I'll give you an analogy.  I'm not

6    a good criminal law person.  Suppose I bring in the

7    defendant and I say, I want to know, you had the knife

8    in your hand, were you really going to stab him?  It's

9    irrelevant.  He just had the knife in his hand and he

10   never did anything, he never did any act.  He was

11   standing there with a knife in his hand.  And suppose he

12   said yeah, I was thinking about it.  I mean, I was

13   thinking about it, but I didn't make up my mind yet.

14   That's kind of what we had here.  No act ever happened.

15   They never went far enough.  They sued in a situation

16   where maybe in your opinion some of these might have

17   gone to the United States.  They never got far enough

18   along to do anything, therefore there's no evidence I

19   ever can put on.  There's nothing at trial.  I can bring

20   in all these people and whether they say, oh, I would

21   have demanded it, but would he have delivered?  I don't

22   know.  And my client would say I never got to the

23   hypothetical situation, so I don't know what I would

24   have done.  I might have done it.  But he never did do

25   it.  That's the problem.  He never did anything.

1          THE COURT:  Okay.

2          MR. TROP:  All right.

3          THE COURT:  So I understand your argument.

4          MR. TROP:  Cybiotronics was FOB, exactly the

5    same thing in the district court decision.  Let me just

6    run through this.  So 14, let's go to the next slide.

7          This slide gives a summary that all the

8    transactions had title transfer received.  Next slide.

9          This slide shows that the jurisdictional case

10   law that they're talking about, Halo, not liability, the

11   Litecubes case, you actually had a sale in the United

12   States, you actually have the sale occurring in the

13   United States.  The Transocean case is what I've been

14   talking about where there was both an agreement to do it

15   in the United States, a written contract agreement

16   contracting to form in the United States and also a

17   delivery to the United States.  Next slide.

18         This is just kind of showing Halo

19   distinguished with 3D and the personal jurisdiction

20   case.  It's saying either that's personal jurisdiction,

21   that's not the same thing.  Next slide.

22         This is the one, Halo distinguished Litecubes

23   and Transocean where there was a U.S. title transfer.

24   So, consistent with all our precedent, we conclude that

25   when substantial activities of a sales transaction,

1   including the final formation of a contract for sale

2   encompassing all essential terms as well as the delivery

3   and performance under the sales contract occur entirely

4   outside the United States, pricing and contracting

5   negotiations in the United States alone do not

6   constitute or transform those extraterritorial

7   activities into a sale within the United States.  In my

8   view, that's all you got.  You got pricing and

9   negotiations.  Not enough.  Next slide.

10          This is sale occurs where title or property

11  transfers. This is the Halo case.  And they're talking

12  about how do you figure out when the sale occurs

13  because --

14          THE COURT:  The thing I don't understand about

15  your argument, I realize that you could put on evidence

16  to establish that there would be no delivery to the

17  United States for use in the United States.  And if that

18  was the proof, you'd prevail; right?  But you haven't

19  done that.

20          MR. TROP:  I don't have to, though.

21          THE COURT:  I know you say you don't have to,

22  but why should they have to respond to something you

23  haven't --

24          MR. TROP:  Well, I did show with respect to

25  one of the transactions that they brought up that even

1    though -- all they've got is the addressee of the

2    quotation.  And in one of the cases that they rely on

3    where the addressee was in the U.S. and the addressee

4    actually bought a hundred, they're not asserting that

5    one because what happened is they came back and said

6    send that hundred to our contract manufacturer in India.

7    That's not that unusual.  There's not so much

8    manufacturing in the United States.  To presume that the

9    United States is the center of the world, it doesn't

10   work entirely anymore.  A lot of these transactions --

11             THE COURT:  I'm with you there.

12             MR. TROP:  -- could have and easily might have

13   gone overseas.  I know if the delivery would have been

14   overseas, the contract manufacturer would have done it.

15   Intent doesn't matter.  I don't see how intent can

16   matter.  The most my client intended, if need be, bring

17   it in.  Suppose a customer intended, need it be, bring

18   it in.  The question is, what did he do other than the

19   things that the cases say aren't enough.  All he did is

20   he undertook a negotiation.  All he did --

21             THE COURT:  But for me to grant summary

22   judgment it's got to be either, okay, that as a matter

23   of law -- as a matter of fact, as a matter of fact --

24   well, no, as a matter of law they can't prove their

25   case; right?  I mean, there's no discovery, there's no

1    anything here.

2             MR. TROP:  I know, but there's nothing they

3    can come up with because it never went far enough.

4    They've got to show -- I can't prove a negative.  I'm

5    saying, look, there's no act in the U.S.

6             THE COURT:  What if they depose your client

7    who says when actually I made that offer it contemplated

8    delivery to the United States, and they said that's what

9    we expected.

10            MR. TROP:  Your Honor, there's no act.  That's

11   the problem.  Intent isn't going to cut bait.  Intent.

12            THE COURT:  No, no, the law you've given me

13   says that an offer that contemplates delivery in the

14   United States is an infringing act.  Doesn't it?

15            MR. TROP:  Let's go back.  Let's read it

16   again.  Well, let me just go through this one real quick

17   while I'm here so I don't get too confused.  So here

18   they're trying to define what a sale is.  They say a

19   sale consists in the passing of title from the seller to

20   the buyer for a price.  They cite a bunch of stuff,

21   defining sale as the transfer of property or title for a

22   price.  Here we know, and there's cases cited in the

23   brief, that FOB transferred title in Taiwan.

24            THE COURT:  You're making this too

25   complicated.  Summary judgment means as a matter of law

1   they can't prove their case.

2           MR. TROP:  They can't.  What act do they show?

3   What act do they show?

4           THE COURT:  I don't know.  They haven't done

5   discovery yet.

6           MR. TROP:  What could they show?  There's no

7   actual --

8           THE COURT:  So therefore, therefore, under

9   your theory an offer can't infringe.

10          MR. TROP:  Your Honor, I told you the

11  Transocean case is an example where it can.  It's a rare

12  case.  It's difficult.  It's a rare case.

13          THE COURT:  Right.  And so I can't decide if

14  this is a rare and difficult case based on your motion.

15          MR. TROP:  Well, there has to be some

16  evidence.  I can't prove a negative.  There's nothing

17  that ever happened.  Because these weren't accepted and

18  there was no contracting to perform in the United

19  States, therefore there's no act.  You have to have an

20  act.  Not intent.  Not bad intent.  Not, you know --

21          THE COURT:  But the act, the act is the offer.

22          MR. TROP:  It is not, your Honor, it is not.

23  That's what the cases say.  The offer is not good

24  enough.  Sending a --

25          THE COURT:  I know an offer cannot be -- I

```
1   understand in summary judgment circumstances an offer is
2   not good enough, but the offer is the infringing act.
3                MR. TROP:  It is not.  It has to contemplate
4   something.  It has to perform some act in the United
5   States.  So what the cases --
6                THE COURT:  It has to contemplate the
7   undertaking of an act.
8                MR. TROP:  Well, let's go back -- well, let me
9   just finish this and we'll go back and --
10               THE COURT:  No, don't go back.  You can finish
11  your argument.  Are we going to talk past each?
12               MR. TROP:  Huh?
13               THE COURT:  Are we going to talk past each
14  other all day?  I understand your argument.  Your
15  argument, I think your argument perfectly characterizes,
16  accurately characterizes the law.  What I don't think it
17  appreciates is how summary judgment works.  That's all.
18  I don't disagree with the way you're describing the
19  applicable law at all.  But in the way burdens work in
20  summary judgment, okay, you're right, you can't prove a
21  negative.  But sometimes in summary judgment, not being
22  able to prove a negative means you lose at summary
23  judgment and you get to go to trial.  That's what it
24  means sometimes.
25               MR. TROP:  But what about burden of proof,
```

1    your Honor, it's their burden of proof.

2             THE COURT:  It's your burden on summary

3    judgment to demonstrate that there's no genuine issue of

4    material fact, that's your burden, and we don't know

5    about this issue, because if this issue was Transocean,

6    we don't know it yet.  That's the whole point.

7             MR. TROP:  No, Transocean, they contracted in

8    the offer to perform in the United States.

9             THE COURT:  There was better evidence in

10   Transocean.  That doesn't mean this isn't Transocean.

11   What if your guy testifies at deposition -- look, you

12   could have put him on.  You could have put an affidavit

13   together to at least put the ball in their court to have

14   to respond to it.  You didn't.

15            MR. TROP:  It wouldn't matter because my

16   client didn't do an act.

17            THE COURT:  I know that -- okay.

18            MR. TROP:  Let me just run through this.  I

19   know --

20            THE COURT:  Don't run through it again.  Run

21   through something.

22            MR. TROP:  I hear you, all right.  So that

23   going on here it says while we have upheld that a sale

24   is not limited to the transfer of tangible property but

25   also may be determined by the agreement by which such a

1    transfer takes place.  So, here, if there never was any

2    transfer, it would have been agreed the only offer was

3    title transfer.  Next slide.

4              Okay, so those are all my arguments.  If you

5    go look at the Cybiotronics case, your Honor, it's

6    exactly on point.  I believe it's a summary judgment

7    decision, and in that case it was FOB transfer, the

8    court said no acts in the United States, you're out.

9              THE COURT:  Getting back to validity.  Well,

10   you know --

11             MR. TROP:  I hear you.

12             THE COURT:  Don't I need to see that prior art

13   to make that call on validity?

14             MR. TROP:  Your Honor, I submitted all the

15   patent office's papers, submitted every single one of

16   them.

17             THE COURT:  Okay.

18             MR. TROP:  So I showed the whole analysis that

19   the patent office did and basically incorporated into my

20   papers.  So the whole analysis is here and --

21             THE COURT:  So --

22             MR. TROP:  It's partially rebutted on a

23   commercial evidence.  They did not come forward here and

24   say oh no, we've got other evidence.  Now I've got a

25   record, I've got a record on summary judgment with one

1    embodiment, commercial success as to one and not the

2    other.  There's ironclad case law that says that's not

3    good enough.  The patent office messed up here, judge,

4    there's no disputing, and the record on summary judgment

5    is clear, they had their opportunity to come in, they

6    could have shown any extra evidence they wanted to put

7    in.  The record before you now is commercial success on

8    one embodiment.  It's clear.

9            THE COURT:  You don't answer my question,

10   though.  I do understand the argument, but is there

11   prior art that I haven't seen?  I think there is; right?

12           MR. TROP:  You mean the prior art that the

13   patent office relied on?

14           THE COURT:  Yeah.

15           MR. TROP:  It's all cited.  I mean, there's no

16   rule that we have to provide a paper copy.  What I put

17   in, the patent office said in view of this patent, this

18   patent, and this patent, you're invalid, and they go

19   through the whole argument.  Mr. Nieves comes back and

20   says why not, and so I put in the patent office's

21   argument as if it were mine.  There's no requirement

22   that I have to go get copies -- they're out there.  They

23   were out there to come back and --

24           THE COURT:  You may very well be right about

25   that, okay.  Thank you.

1          MR. TROP:  All right, next slide.  A couple

2     other things they're arguing.  Sending samples,

3     transmitting quotations to U.S. companies, not a factor.

4     Next one, please.

5          That's all I have.  Thank you, your Honor.

6     Sorry if I pushed the Court, I really think --

7          THE COURT:  No, no, I think we're talking past

8     each other, but I understand your argument.  You're

9     making it in good faith.  Plaintiff's counsel.

10          MR. LUCIC:  I think we're going to take this

11     backwards, your Honor, just because we're thinking about

12     this.  I think we can put this argument with respect to

13     the price quotations to rest here.

14          MR. TROP:  I hate to do -- oh no, all right.

15          MR. LUCIC:  This is the supplemental document

16     that we submitted a few weeks ago, your Honor.  This is

17     a price quotation from Bravotronics to a company called

18     International Assembly in South Padre Island, Texas.

19          THE COURT:  So your argument obviously

20     contemplates delivery to the United States.

21          MR. LUCIC:  Yeah, the language right here is

22     quite clear, your Honor, the destination of this quote

23     is destination U.S., United States.

24          THE COURT:  Now, is that the destination of

25     the quote or destination of the delivery of the

1    purchased goods?

2              MR. LUCIC:  We will --

3              THE COURT:  I assume purchased goods, but I

4    mean --

5              MR. LUCIC:  Yeah, I think the --

6              THE COURT:  I only ask, wait a minute, I only

7    ask that because you just said the destination of the

8    quote.

9              MR. LUCIC:  Yes, the destination for delivery

10   is the United States.

11             THE COURT:  Okay.

12             MR. LUCIC:  The only, the reasonable reading

13   of that quotation is that the destination of delivery

14   would be the United States.

15             I do believe, your Honor, that, you know, the

16   Halo case that is cited by the defendant in this case

17   merely stands for the proposition that if all of the

18   pertinent activity is outside of the United States, then

19   that, then the mere fact that the negotiations for that

20   took place in the United States wouldn't constitute an

21   offer.  But here we have a series of, a series of price

22   quotations by the defendants to United States entities,

23   and the standard here, the standard that one has to look

24   at is --

25             THE COURT:  Can you bring that up again.  That

1    document.  That's March 25, 2015, okay.  Actually pan

2    out.

3                MR. LUCIC:  Let's see.

4                THE COURT:  There you go.

5                MR. LUCIC:  There we go.  Okay.

6                THE COURT:  Yeah, that's the one I was looking

7    at before, okay.  I just want to make sure that was the

8    same document, yeah, okay.

9                MR. LUCIC:  Yeah, and the case law talks about

10   in the context of an offer for sale for infringing

11   purposes, it's essentially the old contract from first

12   year contracts class.  Is this an offer that can be

13   accepted by the other party.  And clearly several of the

14   quotes that are provided here are quotations that are

15   directed to United States companies.  They provide all

16   of the basic information about price, about quantity,

17   about shipping terms, all these other kinds of things.

18                So, the question really is could that, could

19   the United States company, the recipients of this

20   quotation, execute the acceptance of that offer.  And

21   the fact that there might be some theoretical, you know,

22   other destination for this isn't really the question.

23   The question is, could that United States company have

24   executed that acceptance.  Could they have simply said,

25   yes, send me 200 of those.  That offer was sent into the

1   United States.  It wasn't sent into the United States

2   saying, yeah, but we only sell these in China, we only

3   sell these in India.  This was an offer that could have

4   been accepted by a United States-based entity, and that

5   United States entity could have said yes, we'll take a

6   hundred of those at that price.  That's all that is

7   required.

8            THE COURT:  Looks like you're conflating

9   different arguments.  Mr. Trop was focused on this idea

10  of an infringing act in the United States being

11  contemplated by the offer and a lack thereof.  And I'm

12  pretty much going to accept the idea that these were

13  offers that could be accepted.

14           MR. LUCIC:  Right.

15           THE COURT:  I think the case law supports

16  that.  He didn't really argue that in his oral argument.

17  He focused on this idea that not that they weren't

18  offers, but they weren't offers that contemplated an

19  infringing act in the United States.  And that's really,

20  I guess that's what your exhibit goes to.

21           MR. LUCIC:  The exhibit goes to that, but it's

22  also the broader question, your Honor, because --

23           THE COURT:  Offer at all.

24           MR. LUCIC:  Offer at all.  Our point is that

25  the uncertainty that Mr. Trop is referring to doesn't

1   matter in this context.  If Oncque sent an offer into

2   the United States and the United States entity could

3   have said yes, I agree, we're buying 500 of these at

4   this price, ship them, whether it was FOB Taiwan or not,

5   we know that's not the standard.

6               THE COURT:  Right.

7               MR. LUCIC:  Okay.  We know this an offer

8   that was capable of being done.  There was nothing in

9   the documentation that we had received from the

10  defendants here that said, you know, on these quotes,

11  oh, by the way, you can do this but we don't ship this

12  to the United States, we're not going to do that.

13  That's not what these documents say.  So, they were

14  capable of being executed and capable of being delivered

15  and that's all that needs to be shown here.

16              So, I don't want to belabor the point because

17  I do believe based on the supplemental document, I don't

18  think that there is any question that at least in one

19  instance there is a -- there was an offer for sale that

20  directly contemplated --

21              THE COURT:  What about validity, though?

22              MR. LUCIC:  Okay, we'll go to validity.  If I

23  may just, while I'm on --

24              THE COURT:  Sure.

25              MR. LUCIC:  While I'm on this subject because

1    it does relate here.

2            THE COURT:  I didn't mean to push you off

3    that.  Go ahead.

4            MR. LUCIC:  Just put this -- because Mr. Trop

5    I think correctly defined the two general areas in which

6    there's disagreements.  In their briefs they talked

7    about this notion of whether or not the offers for sale

8    prior to the reexamination could have been, you know,

9    can constitute offers for sale in light of the

10   reexamination.

11           We've stated in our briefs that the test for

12   that is whether or not there were substantially

13   identical claims that existed.  Following the reexam,

14   remember, it's important in the context of the reexam to

15   in the sequence here, there was never a point at which

16   there were not allowed claims in the context of the

17   cancellation procedure.  What happened was the Patent

18   and Trademark Office allowed certain claims as a result

19   of the showing of commercial success.  At that point in

20   time they asked SignalQuest to cancel and renumber their

21   claims.

22           THE COURT:  Yeah.

23           MR. LUCIC:  So the notion that there is

24   somehow this amorphous period where we had somehow

25   cancelled all of our claims really is not the case.  The

1  cancellation and renumbering only took place after the

2  claims had been allowed.

3          THE COURT:  His argument is that your

4  cancellation makes it impossible to show that the claims

5  are identical; right?

6          MR. LUCIC:  Yeah, I mean --

7          THE COURT:  Now, I get the argument, it's

8  actually interesting, but I don't have the authority for

9  that proposition.  Is there authority for that

10 proposition, Mr. Trop?

11         MR. TROP:  So basically it's in the statute --

12 I hate to say this, but I'm not sure how it plays out,

13 but it's in the statute.  So if you read the statute, 35

14 USC 252, there's two different provisions.  One says it

15 has to be substantially identical.  The second provision

16 says the claim in the original patent.  So when you

17 cancel all of your claims, you no longer have a claim

18 from the original patent.

19         THE COURT:  All right.

20         MR. TROP:  And that section --

21         THE COURT:  I understand the argument.

22         MR. TROP:  That's the only authority I have.

23         THE COURT:  Okay.  And that's a fair argument,

24 but there's not interpretive authority putting the same

25 gloss on it that you are in your brief.

1          MR. TROP:  The only interpretative authority

2     is in the notes to the revision.  The second clause, the

3     one I'm relying on, was added according to the reviser's

4     notes saying that this was added to add additional

5     features to the right that you have.  And so that would

6     be an additional feature and it's pretty explicit

7     language.  So I don't have any, I think you're right, I

8     have no case authority, but somebody has to go there and

9     somebody has to decide it.

10          THE COURT:  Why not me, right?

11          MR. LUCIC:  Well, I --

12          THE COURT:  Thank you, I appreciate that

13     straight answer.

14          MR. LUCIC:  Right, and in this case, your

15     Honor, we can show you the slide, if there's any

16     question here.

17          MR. NIEVES:  Your Honor, just, you see on the

18     screen.

19          THE COURT:  Yeah.

20          MR. NIEVES:  On the left-hand side, that's the

21     original claim, claim number one and claim number four.

22     Claim number four depends from claim number one.  So

23     basically what you do is you take limitations of claim

24     number four and add them to claim number one, and that's

25     the new claim 55, which basically means that it's

1    identical.  There is no difference.  And we actually

2    lined it up for you on this slide to show you that every

3    single element of dependent claim one plus, I mean

4    dependent claim four plus independent claim one equals

5    the claim 55.  There is no difference.  Not only are

6    they substantially identical, but they are identical.

7                    THE COURT:  I see.

8                    MR. LUCIC:  Okay.  So, I think we will -- a

9    couple of minor points we would like to conclude with,

10   but I think to refocus us now on this argument of

11   invalidity, the summary judgment for invalidity, I don't

12   want to belabor this because we talked about this --

13                   THE COURT:  Talked about it in the claim

14   construction.

15                   MR. LUCIC:  Right, we talked about the --

16                   THE COURT:  This for me is the -- this brings

17   an important argument because I'll be straight with

18   everybody here, I think on most of the claim

19   construction arguments I tend, I'm taking a view that's

20   more consistent with the plaintiff's proposals, but this

21   one is a problem for me, I'm struggling with this one,

22   so take the time you need.

23                   MR. LUCIC:  Understood, understood.  So, I

24   think having an understanding of the Muniauction case I

25   think is really critical to understanding exactly how

1    this plays out in the context, what the results of this

2    -- what this reexamination means in terms of the claims

3    here.

4            We believe and we've argued it in our briefs

5    that the defendant here really is overstating what

6    Muniauction really stands for.  Muniauction I think is a

7    much narrower case than what they would propose.

8    Muniauction essentially is a case that, first of all, it

9    was not the result of a reexam at the Patent and

10   Trademark Office.  It was finding by the district court

11   of commercial success and then which was subsequently

12   overturned by the Federal Circuit.  It was not a coming

13   out of the, you know, the to and fro that takes place

14   within the reexamination process that we've discussed at

15   some length today.

16           Muniauction really is a nexus case.  It talks

17   about the, it really goes to the fact that you can't

18   really tell based on the glowing reviews that the

19   patentee in that case tried to demonstrate.  What

20   essentially the Federal Circuit found in the Muniauction

21   case, you really can't tell based on the reviews that

22   were presented exactly what feature it was that was the

23   cause of the commercial success, because some of the

24   features that they talked about, they talked in glowing

25   terms about some of the features that were clearly not

1    patentable, and so therefore it was unclear that there

2    was a nexus formed between the showing of commercial

3    success.  It's like, look, we sold this product and look

4    at all this great press that we got about it.  It did

5    not talk about the actual -- it made it clear that,

6    well, we can't tell based on what you said that the

7    elements that you're trying to claim are really the

8    cause for your commercial success, so we're going to say

9    no, you're not entitled to commercial success on this.

10   We've got a very different case here.  We have a

11   situation where the patent office as we know determined

12   that the claims were obvious, the product was presented

13   with Mr. Kelley's affidavit which is part of the packet

14   that's been submitted to the Court and it's part of the

15   package of materials here, that makes it quite clear

16   exactly what the, that the very features that this

17   product had were the basis for obtaining commercial

18   success.  It wasn't based on some other factor like the,

19   you know, some feature that was not part of the claims

20   that were in issue.

21           So Muniauction really just, really just tells

22   us something that we all I think essentially agree to,

23   which is in order to obtain commercial success for a

24   product, you have to show that the product that has

25   commercial success is, you know, has the elements of the

1   claim, the claims that you're trying to get the court or

2   the patent office in our case to allow, and that the

3   reason, the reason that the product was successful is

4   related to those very features, and that's exactly what

5   we have here.

6            MR. NIEVES:  If I might add one thing, your

7   Honor.  Muniauction does not say that if there's an

8   independent claim that covers five elements but the

9   specification talks about 40 or 50 elements, that to get

10  that independent claim that covers five, you now have to

11  show commercial success for 40 or 50 elements.  That's

12  not what it says.  It says each of the elements of the

13  claim must be taught by the element or the product that

14  you're utilizing for showing of commercial success.  If

15  those elements are contained there, then commercial

16  success is successful, and you have, you overcome the

17  obviousness rejection.

18            The other part that I'd like to add is the

19  significance of what we as a court are trying to decide

20  here.  If what we're saying is that the cancellation of

21  a claim ever during prosecution actually equates to an

22  express disavowment, that means if I file a patent with

23  50, 60 claims, and I just decide to get rid of five of

24  them, all people now have to do going forward is to look

25  at their product that's been accused of infringement,

1    without any further arguments, without any further

2    amendments or anything, and say hold it, are any of the

3    limitations of my product contained in anything that's

4    been cancelled, ever, regardless of arguments,

5    regardless of amendments.  If the answer is yes, oh, I

6    don't infringe.  That's not what the court cases say.

7    That's not what Rheox said.  Because they know how

8    significant of an issue this is.  That's not what

9    Genentech said.  None of them did.  Now, granted, in

10   Genentech and Rheox you've got arguments as well, but

11   we're so far detached from that, we have claims that

12   have nothing to do with the issue at all.  So to then

13   say that an element that's in a dependent claim now

14   somehow is to be imputed into all the claims, it just

15   doesn't work.

16          So that's why we're saying that it needs to be

17   more than just cancelling the claim.  That's essentially

18   what we're saying.

19          THE COURT:  I've been asking that question all

20   day.

21          MR. LUCIC:  And just very briefly.  I think

22   it's important to look at the Applied Materials case

23   which we cited in our brief.  I don't believe the

24   defendants refer to it.  But the Applied Materials case

25   I think is really an important one to emphasize Mr.

1   Nieves's point, you know, they found objective evidence

2   of commercial success on the added ground that the

3   claims are broader than what the Applied Materials

4   successful commercial embodiment.  The patentee need not

5   show that all possible embodiments within the claims

6   were successfully commercialized in order to rely on the

7   success in the marketplace of the embodiment that was

8   commercialized.

9           And I think here, I mean, I think everybody

10  agrees on the fundamental premise here, which is that

11  the features of the successful product, the none, the

12  features that don't relate to the actual claims, are not

13  then imported into the claims.  So, if they were

14  unrelated, if they were related features of the claim

15  device or the device that is supposed to show the

16  commercial success of the invention, that those

17  additional things are automatically imported into the

18  limitations language.  The only basis, really, for the

19  premise that defendants are putting forth here is the

20  effect of the cancellation of that claim 14, entirely on

21  that.  And I think we've gone over this a number of

22  times.  Essentially we're looking at it from the

23  opposite sides of the issue.  They keep on saying, well,

24  we can't claim, you know, we can't assert infringement

25  over the square-like shape or the square shape.  We

1    agree with that.  We are not asserting that claim.  We
2    are not -- the nuance here really is that that doesn't
3    mean that they can't infringe all the other elements of
4    the independent claim that's out there.  You can't
5    import that back into the independent claim, which is
6    essentially what they're trying to do.  They're
7    essentially trying to force SignalQuest into doing what
8    happened in the Rheox case where the independent claim
9    had to be amended in order to deal with the chemicals
10   that the Rheox patentee in that case had told the patent
11   office that it wasn't going to try to claim a patent
12   over.  They had to amend that claim.  The patent office
13   didn't make SignalQuest come in and amend its claim, the
14   independent claim as a result of all this.  They simply
15   said, no, you can't have it.  The claim was cancelled.
16   Cancellation happens all the time throughout the
17   prosecution process from the outset when you initially
18   apply for your patent or subsequently during a
19   reexamination or during a review or any of these other
20   kinds of processes.  These kinds of things happen all
21   the time.  Cancellation does not necessarily mean that
22   you are -- you are making some sort of an express
23   disavowal.  And the language we believe is pretty clear
24   that in order to disavow something, in order to disclaim
25   something, it really does have to be clear and precisely

1   on that issue.

2            THE COURT:  Yeah.  All right.  Anything else?

3   Mr. Trop, you can get the last word.  Oh, wait.  You

4   will still get the last word, don't worry.

5            MR. LUCIC:  They had made -- they made two

6   other arguments in their motion for summary judgment

7   that I just want to touch on very briefly.

8            One was they said Mr. Chou is not properly a

9   party.  The argument there simply is, your Honor, that

10  the claim against Mr. Chou is for indirect infringement.

11  It's not for direct infringement.  So the notion that

12  he's not the signatory of these offers for sale really

13  doesn't matter.  The claim here is that he has induced

14  Oncque to do so.

15           There is also an argument that was inserted

16  that basically said, well, you know, Bravotronics is,

17  you know, is different than that.  We would simply refer

18  your Honor to Exhibit 3 of our objection to the motion

19  for summary judgment.  This is, for the record, it is

20  0C066470, and this document is filed under seal, your

21  Honor, so counsel, we've talked about it, I'm not going

22  to discuss the particulars of it, but for the record you

23  can look at that particular document, but there's a

24  statement that's pretty clear in here that says Oncque

25  Corporation and Bravotronics Corporation are operated

1    under the same boss and the boss's wife and the same

2    staff.  So Oncque in fact equals Bravotronics.  And

3    that's consistent with the, if the Court recalls, the

4    inclusion of Bravotronics into the litigation and their

5    insertion in this.  So that, we don't believe that

6    there's any further issue on that.  So, with that -- you

7    have anything else?

8              MR. NIEVES:  No.

9              THE COURT:  Defendant's counsel.

10             MR. TROP:  There is some confusion of two

11   different things and hopefully it's not my fault.

12             So I argued for non-infringement and that's

13   where the disavowal comes up, and that's mostly where

14   the cancellation comes up with.  And so they argued all

15   that in the context of summary judgment.  It doesn't

16   have any bearing on summary judgment.  The summary

17   judgment is based on the fact that we've made a showing

18   that the claims cover two different embodiments, and

19   they're not disputing that.  We made a showing that one

20   of those embodiments is not patentable.  And we made a

21   showing that they made no commercial success evidence

22   with respect to one of those two embodiments.  And we

23   have a Federal Circuit case which I don't understand

24   what they're talking about, but it says in no uncertain

25   terms, if you put two embodiments in your specification

1   and you want commercial success, you've got to do it for

2   both embodiments, and they didn't do it.  That's

3   disavowal, your Honor.

4          THE COURT:  Give me a moment.

5          MR. NIEVES:  Your Honor.

6          THE COURT:  Yes.

7          MR. NIEVES:  Are we allowed to make one more

8   statement just to clarify the last issue?

9          THE COURT:  Yes.

10         MR. NIEVES:  Just to be clear, the shapes, the

11  specifications, the claims, first, again, the claims

12  don't even mention it, but when you go to specification

13  it specifically says that you can have circular, square

14  or any other shape.  So essentially we don't have a

15  situation where one example is being provided and

16  another is not.  Again, we have claims that don't even

17  talk about shapes.  Again, I thank you for your time.

18         THE COURT:  You said you made a showing.  That

19  was before the Patent and Trade Office.  You're not

20  talking about your summary judgment showing.

21         MR. TROP:  Your Honor, I submitted as exhibits

22  all the summary judgment, all the arguments that the

23  patent examiner made, so all the --

24         THE COURT:  I have to presume the validity of

25  the patent now, don't I?

1          MR. TROP:  Pardon me?

2          THE COURT:  I have to presume the validity of

3    the patent now.

4          MR. TROP:  You do.  You do, your Honor.  But

5    there's no, in other words, I put in a prima facie

6    showing of invalidity by saying I adopt what the patent

7    office said.  The patent office reasoned, and all their

8    reasoning is in there, and there's been no rebuttal of

9    it, no question of it, in fact as they keep pointing

10   out, they did cancel the claim.  So we have two

11   embodiments and commercial success to only one, and

12   there's no evidence of the commercial success on the

13   second.  And there's two embodiments, as Mr. Nieves

14   pointed out again, there's two embodiments in the

15   specification, the square and the round, they're both in

16   there, and you had to have commercial success for both.

17         THE COURT:  Have you -- thank you.  Have you

18   each entered your power point presentations as part of

19   the record?  Like are they -- why don't you do that.

20   You can submit them -- Charli, what's the best way --

21         THE CLERK:  I'm happy to scan it.

22         THE COURT:  If they are submitable by ECF,

23   just do it.  I'm talking about the power points, they

24   are helpful, they are very well done.

25         MR. LUCIC:  Is a thumb drive helpful or would

```
 1   you --
 2              THE CLERK:  Counsel, you can docket using
 3   other documents in the ECF.
 4              MR. LUCIC:  Other documents?  Fine, we'll take
 5   care of that.
 6              THE COURT:  I want to thank counsel for their
 7   presentations.  Very professionally done.
 8              MR. LUCIC:  Thank you, your Honor.
 9              THE COURT:  I appreciate it.  I know it's a
10   long day.
11              MR. LUCIC:  Appreciate it.
12              MR. NIEVES:  Thank you, your Honor, for your
13   time.
14              (Hearing concluded.)
15
16              C E R T I F I C A T E
17
18              I, Sandra L. Bailey, do hereby certify that
19   the foregoing transcript is a true and accurate
20   transcription of the within proceedings, to the best of
21   my knowledge, skill, ability and belief.
22
23
24   Submitted: 2/17/2016        SANDRA L. BAILEY, LCR, CM, CRR
25                               LICENSED COURT REPORTER, NO. 15
                                 STATE OF NEW HAMPSHIRE
```